CITIZENS to ESTABLISH a REFORM PARTY
in Arkansas, et al. *v.* Sharon PRIEST, in Her Official Capacity
as Secretary of State for the State of Arkansas

96-639                                                926 S.W.2d 432

Supreme Court of Arkansas
Opinion delivered July 8, 1996

*Cuddy & Lanham*, by: *Samuel Lanham, Jr.*, of Counsel, and *Williams & Anderson*, by: *G. Alan Perkins*, for appellants.

*Winston Bryant*, Att'y Gen., by: *Angela S. Jegley*, Asst. Att'y Gen., for appellee.

BRADLEY D. JESSON, Chief Justice. This case concerns the appellants' efforts to establish the Reform Party as a new political party in the State of Arkansas. Their objective is to field a slate of candidates for national, state, and county offices in the 1996 general election. Arkansas law provides two means of forming a new political party. The convention process permits a political group to hold a convention for the purpose of choosing presidential and vice-presidential candidates. See Ark. Code Ann. § 7-8-302 (Repl. 1993). If the candidates poll at least three percent of the vote in the general election, the candidates' group is established as a political party. See Ark. Code Ann. § 7-1-101(1)(A) (Supp. 1995). The petition process, which was used by these appellants, permits a political group to submit a petition to the Secretary of State declaring its intention of organizing a political party. The petition must contain the signatures of qualified electors equal in number to at least three percent of the total vote cast for the office of Governor or nominees for presidential electors at the last preceding election. See Ark. Code Ann. § 7-1-101(1)(A) (Supp. 1995); Ark. Code Ann. § 7-7-203(g) (Supp. 1995).

The central issue in this case concerns the deadline by which such a petition must be filed. There are two Arkansas statutes which address the deadline and they are in utter conflict. Ark. Code Ann. § 7-1-101(1)(B) (Supp. 1995) sets out the deadline as follows:

> Except in preferential presidential primary elections, the petition shall be filed with the Secretary of State not later than 12:00 noon of the first Tuesday in May before the preferential primary election in which the political party filing the petition desires to participate.

Ark. Code Ann. § 7-7-203(g) sets out a different deadline:

> The petitions shall be filed with the Secretary of State no later than 12:00 noon on the first Tuesday in the fourth month before the preferential primary election....However, this subsection does not apply to preferential presidential primary elections.

Two problems are readily apparent. First, under § 7-1-101(1)(B), the effective filing deadline in 1996 was May 7. Under § 7-7-203(g), the effective filing deadline for 1996 was January 2. Second, each statute exempts preferential *presidential* primaries from its application. The trial judge resolved these matters by holding that the January 2 deadline in § 7-7-203(g) was controlling and that the legislature did not intend to exempt presidential primaries from § 7-7-203(g). We agree and affirm.

The facts of this case are undisputed. In November of 1995, Deborah Kraus, a political consultant for the Reform Party, approached a representative of the Secretary of State's office to discuss procedures for formation of a new political party. She was told that her group would have to submit a petition containing 21,505 signatures, which was three percent of the total votes cast for Governor in the 1994 election. She was further told that the deadline for filing the petition with the Secretary of State was January 2, 1996. On that date, the appellants presented a petition containing 28,546 signatures. Forty-five days later, the Secretary rejected the petition after concluding that only 17,262 of the signatures were valid.

Upon rejection of their petition, the appellants reviewed the law and discovered the conflict which exists between § 7-1-101(1)(B) and § 7-7-203(g). They then took the position that the deadline for filing their petition was not January 2, 1996, as established by § 7-7-203(g), but May 7, 1996, as established by § 7-1-101(1)(B). On May 6, 1996, they tendered to the Secretary of State a petition containing 7,000 new signatures and purported proof that 1,952 signatures from the original petition had been wrongfully rejected. The Secretary refused to accept the tender and reasserted the January 2, 1996 deadline. The appellants immediately filed suit in Pulaski County Circuit Court, seeking the following relief: 1) a writ of mandamus directing the Secretary to accept the May 6 petition and declare the Reform Party a new political party in

Arkansas; 2) a declaration that the May 7 deadline set out § 7-1-101(1)(B) was the operative deadline; 3) a declaration that neither § 7-1-101(1)(B) nor § 7-7-203(g) provided a deadline for a new party to participate in a *presidential* preferential primary election; and, 4) a declaration that the Secretary's refusal to accept the May 6 petition violated the Arkansas Civil Rights Act of 1993.

A hearing was held on May 9, 1996, just three days after the lawsuit was filed. On May 14, 1996, one week before the State's preferential primary election, the trial judge issued a letter opinion in which he held that the controlling deadline was January 2, 1996, pursuant to § 7-7-203(g). The judge further held that the legislature did not intend to exempt new parties wishing to participate in *presidential* preferential primaries from the January 2 deadline. Finally, the judge held that no violation of the Arkansas Civil Rights Act had occurred. The letter ruling was memorialized in an order entered May 17, 1996 and it is that order from which the appellants bring their appeal.

██ The basic rule of statutory construction, to which all other interpretive guides must yield, is to give effect to the intent of the General Assembly. *Pugh* v. *St. Paul Fire & Marine Ins. Co.*, 317 Ark. 304, 877 S.W.2d 577 (1994). As a guide in ascertaining legislative intent, we often examine the history of the statutes involved, as well as the contemporaneous conditions at the time of their enactment, the consequences of interpretation, and all other matters of common knowledge within the court's jurisdiction. *City of Little Rock* v. *AT&T Comm.*, 318 Ark. 616, 888 S.W.2d 290 (1994); *Mears* v. *Arkansas State Hospital*, 265 Ark. 844, 581 S.W.2d 339 (1979). A brief review of legislative history in this case shows the genesis of the conflict between § 7-1-101(1)(B) and § 7-7-203(g).

### 1971 Legislation

The first conflict between the statutes appeared after the passage of Acts 261, 347 and 829 of 1971. Act 261 established a deadline which fell during the month of May under § 7-1-101(1)(B). Acts 347 and 829 established a deadline which fell during the month of March under § 7-7-203(g).

### 1977 Legislation

In 1977, a federal court ruled that the conflict between § 7-1-101(1)(B) and § 7-7-203(g) rendered the new-party-petition dead-

line vague and unenforceable. *American Party of Arkansas* v. *Jernigan*, 424 F. Supp. 943 (E.D. Ark. 1977). Special note was made of the confusion engendered by piecemeal amendment of the State's election laws. In response to the federal court ruling, the legislature passed Act 888 of 1977. The Act established an identical deadline for both § 7-1-101(1)(B) and 7-7-203(g): the first Tuesday in May before the preferential primary. For the moment, the conflict was resolved.

### 1987 Legislation

Ten years later, a new set of significant election laws was enacted. Act 123 of 1987 created a separate and distinct *presidential* preferential primary to be held the second Tuesday in March (the preferential primary for state and county offices was scheduled two weeks before the second Tuesday in June). Section 1 of the Act contained the requirements for forming a new political party with the purpose of participating in the presidential primary. The petition deadline was the second Tuesday in November in the year preceding the presidential primary. The legislature did not change the "first Tuesday in May" deadlines contained in § 7-1-101(1)(B) and § 7-7-203(g). However, language was inserted into those statutes to show that they were inapplicable to preferential *presidential* primary elections. Section 7-1-101(1)(B) now began with the phrase "except in preferential presidential primary elections..." and § 7-7-203(g) now ended with the phrase "this section does not apply to preferential presidential primary candidates."

In the same legislative session, the General Assembly passed Act 248 of 1987 and it is here that we see the origin of the present conflict. Without explanation, § 7-7-203(g) was amended to read, in pertinent part, as follows:

> The petitions shall be filed with the Secretary of State no later than twelve o'clock (12:00) noon on the first Tuesday in the fourth calendar month before the preferential primary election.

Act 248 not only changed the statute's May deadline to a January deadline, it removed all language excepting *presidential* primaries from the statute's application. Thus, at the end of 1987, election laws pertaining to new-party-petition deadlines were in hopeless conflict. One law imposed a November deadline for parties wishing to run a candidate in the presidential primary; another

law imposed a May deadline but excepted presidential primaries; and a third law imposed a January deadline with no exceptions.

### 1989 Legislation

Two years later, some of this confusion was alleviated. Act 700 of 1989 repealed those parts of Act 123 of 1987 pertaining to presidential primaries. Thus, the separate and distinct presidential primary, along with the November deadline, ceased to exist. Sections 7-1-101(1)(B) and 7-7-203(g) continued in full force and effect. However, even though it was no longer necessary, each statute continued to reflect that its provisions were inapplicable to presidential primaries. In the case of § 7-1-101(1)(B), it is clear that the legislature simply failed to address the further necessity of the presidential-primary exception. In the case of § 7-7-203(g), the presence of the presidential-primary exception was more puzzling. Act 248 of 1987 completely removed all such language from the statute. Yet the following phrase, somewhat modified from its original form, appeared in the Arkansas Code version of the statute:

> this *sub*section does not apply to preferential presidential primary *elections*. (Emphasis added to show modification of language).

See Ark. Code Ann. § 7-7-203(g) (Supp. 1987). See also the 1989, 1993, and 1995 Supplements and the 1993 Replacement volume.

### 1995 Legislation

We arrive now at the contemporary legislation that was spawned by this history. Three Acts pertaining to election laws were passed by the legislature in 1995. The first, Act 901, was passed for the purpose of establishing state-supported primary elections.[1] Although Act 901 did not purport to amend § 7-7-203(g), it set out the January deadline and, inexplicably, added the type of language which had been deleted by Act 248 of 1987: "this subsection does not apply to preferential presidential primary elections." This language is identical to that contained in the Arkansas Code beginning in 1987.

---

[1] The Eighth Circuit had just decided that political parties could not be required to pay for their own primaries. *Republican Party of Arkansas v. Faulkner County*, 49 F.3d 1289 (8th Cir. 1995).

Acts 946 and 943 were passed for the purpose of complying with the National Voter Registration Act of 1993. See 42 U.S.C. §§ 1973gg to gg-10 (Supp. 1996). Neither Act purported to amend § 7-1-101(1)(B), yet they each reiterated the May deadline and the statute's presidential-primary exception. These Acts were approved two days after Act 901 was approved.

■ With this history in mind, we turn to our analysis of the issues. We address first the language of both statutes, which excepts presidential primaries from their application. The exception is superfluous in both cases. It is held over from a time when it was necessary to distinguish between presidential and nonpresidential primaries. Once Act 700 of 1989 did away with separate presidential primaries and their corresponding November deadline, the exception contained in § 7-1-101(1)(B) and § 7-7-203(g) was no longer necessary. Words that the legislature has inadvertently left in a statute and that are unnecessary or serve no useful purpose may be disregarded. *City of Fort Smith* v. *Tate*, 311 Ark. 405, 844 S.W.2d 356 (1993); 2A N.J. Singer *Sutherland Statutory Construction*, § 47.37 (5th ed. 1994). Further, repeal of one act may render provisions of another act meaningless. *Witt* v. *Arkansas Game & Fish Comm'n*, 195 Ark. 21, 110 S.W.2d 704 (1937).

■ We also note that, in the case of § 7-7-203(g), the presidential-primary exception appears to have been included by mistake. As previously stated, the legislature eliminated the exception in Act 248 of 1987. Nevertheless, it was erroneously included in the Code beginning with the 1987 Supplement. In drafting Acts 946 and 963 of 1995, the legislature obviously looked to the Code provisions. The language used in those Acts does not reflect the original language contained in Act 123 of 1987. It mirrors the modified version of the exception which erroneously appeared in the Arkansas Code. We are reluctant to interpret a statute in a manner contrary to its express language, but we cannot allow a drafting error or codification error to circumvent legislative intent. *Rosario* v. *State*, 319 Ark. 764, 894 S.W.2d 888 (1995); *Cox* v. *City of Caddo Valley*, 305 Ark. 155, 806 S.W.2d 6 (1991).

■ Finally, the legislature could not have intended that new parties wishing to run a candidate for president be completely exempt from any petition deadline. The appellants admitted to the trial court that some type of deadline was necessary, as a practical matter. We will not adopt an interpretation of the law that leads to

an absurd result. *Henson v. Fleet Mtg. Co.*, 319 Ark. 491, 892 S.W.2d 250 (1995). We therefore hold that the legislature did not intend to except presidential primaries from the application of the new party petition deadlines in these statutes, § 7-7-203(g) in particular.

■ We now turn to the question of which deadline must prevail. The statutes are in hopeless conflict, so one must control and one must yield. The appellants urge us to adopt the approach we have often taken when two statutes are in conflict with each other, i.e., the latter act controls. See *Gibson v. City of Trumann*, 311 Ark. 561, 845 S.W.2d 515 (1993); *Roberts v. Tice*, 198 Ark. 397, 129 S.W. 2d 258 (1939). They point to the fact that Acts 946 and 963 of 1995, which set out the May deadline, were passed two days later than Act 901 of 1995, which sets out the January deadline. We decline to make a rigid application of the "last passed" rule in this case. In *Horn v. White*, 225 Ark. 540, 284 S.W.2d 122 (1955), we observed that the rule must yield when its application would undermine legislative intent. We stated the following:

> Where Acts passed at the same session contain conflicting clauses, the whole record of legislation will be examined to ascertain the Legislative intent, and such intent, if ascertained, will be given effect, regardless of priority of enactment.

■ It is also noteworthy that, since 1987, the only enactments of the deadlines in either statute were in the nature of nonamendatory reenactments. Act 241 of 1991 and Acts 946 and 963 of 1995 merely retained the May deadline originally established in Act 123 of 1987. Act 901 of 1995 merely retained the January deadline from Act 248 of 1987. When an act amends the law, portions of the law that are not amended but simply retained are not thought of as new enactments. *Peterson Produce Co. v. Cheney*, 237 Ark. 600, 374 S.W.2d 809 (1964). Resorting to the "last passed" rule under such circumstances would elevate mechanical application over thoughtful analysis.

■ In divining the intent of the legislature, we may construe the statutes in question by looking to all laws on the subject, viewing them as a single system and giving effect to the general purpose of the system. *Hercules, Inc. v. Pledger*, 319 Ark. 702, 894 S.W.2d 576 (1995); *Pace v. State Use Saline County*, 189 Ark. 1104, 76 S.W.2d 294 (1934). When we view our State's system of election

laws as a whole, it is clear that the January deadline contained in § 7-7-203(g) would most likely serve the intention of the legislature.

■ The May deadline contained in § 7-1-101(1)(B) is virtually unworkable under Arkansas's scheme of election laws. Political party nominees in special or general elections must be selected first at a primary election. *Lewis* v. *West*, 318 Ark. 334, 885 S.W.2d 663 (1994). In 1996, the preferential primary election fell just two weeks after the May 7 deadline established by § 7-1-101(1)(B). A potential political party submitting its petition on May 7 could not, from a practical standpoint, have participated in the primary process. Jacque Alexander, Director of Elections for the Secretary of State, testified below that her office had needed thirty days to review the 28,546 signatures submitted in the original petition. The January deadline would allow a proper review of petition signatures; a May deadline would not. Additionally, various statutory deadlines that peaceably coexist with a January 2 deadline would be rendered · meaningless if the May 7 deadline prevailed. See Ark. Code Ann. § 7-7-203(c) (Supp. 1995) (party pledges and filing fees in March and April); Ark. Code Ann. § 7-7-203(d) (Supp. 1995) (certification of candidates in March); Ark. Code Ann. § 7-7-305(b) (Supp. 1995) (drawing for ballot positions in April); Ark. Code Ann. § 7-5-418(a) (Supp. 1995) (early voting beginning on May 6). Interpretation of a statute that leads to absurd or unworkable consequences will be rejected. *Henson* v. *Fleet Mtg. Co.*, *supra*; *Horn* v. *White*, *supra*.

The appellants argue that the trial judge invaded the province of the legislature by considering the wisdom or expediency of the statutes involved. It is true that courts must take care when interpreting statutes to avoid overstepping the bounds of the judiciary function. However, that was not done in this case. The trial court was faced with the task of choosing between two conflicting statutes. It was proper, and in fact necessary, for the court to consider the practical effect of choosing one statute over another.

Finally, we observe that the last purposeful, unadulterated enactment of a new-petition deadline, which was not the product of a mere restatement of existing law, occurred in Act 248 of 1987. That act established a January deadline with no exceptions of any kind.

■ In light of the foregoing, we are convinced that the

deadline contained in § 7-7-203(g) best reflects the intention of the legislature. Since that deadline for purposes of 1996 would have been January 2, and since the appellants did not file a meritorious petition by that date, they failed to qualify as a new political party.

The appellants conceded in oral argument that the viability of their claim under the Arkansas Civil Rights Act of 1993, Ark. Code Ann. §§ 16-123-101 to 108 (Supp. 1995) was dependent upon our ruling with regard to the statutory deadline. In light of our holding, it is not necessary to address the appellants' civil rights claims.

In closing, we note that the relief sought by the appellants in this case is unusual. They do not wish to hold a primary. Rather they ask that we allow them to hold a convention for the purpose of selecting candidates for the general election in November, much the way a vacancy in office is filled. See Ark. Code Ann. § 7-7-104(a)(1) (Repl. 1993). Since we are holding against the appellants on the deadline question, we do not reach the issue of whether such a remedy is available, in light of *Lewis* v. *West, supra.*

Affirmed.

DUDLEY, J., not participating.