**CITIZENS TO ESTABLISH A REFORM PARTY IN ARKANSAS, et al., Plaintiffs,**

v.

**Sharon PRIEST, Secretary of State for the State of Arkansas, Defendant.**

**No. LR–C–96–185.**

United States District Court, E.D. Arkansas.

July 31, 1996.

As Amended Aug. 14, 1996.

Samuel W. Lanham Jr., Doris A. Harnett, Cuddy & Lanham, Bangor, ME, G. Alan Perkins, Williams & Anderson, Little Rock, AR, for Plaintiffs.

Timothy Gerard Gauger, Arkansas Attorney General's Office, Little Rock, AR, Angela S. Jegley, U.S. Attorney's Office, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Trial was held before the Court on July 22nd through 26th. After hearing the testimony, reviewing the exhibits and weighing the arguments of counsel, the Court now makes the following decision.

### FINDINGS OF FACT

1. Plaintiffs Citizens to Establish a Reform Party in Arkansas ("Reform Party") and certain individuals associated with the party seek recognition as a new political party in Arkansas for the purpose of enlarging the opportunities of all Arkansas voters to express their political preferences, thereby influencing and shaping the future of government. The individual Plaintiffs, all of whom are Arkansas voters, see rights to associate and competition in ideas and governmental policies as at the core of the electoral process and First Amendment freedoms.

2. On February 16, 1996, Defendant Secretary of State Priest rejected Plaintiffs' petition to qualify as a new political party, claiming that the Reform Party had not met the signature requirements established by Ark.Code Ann. § 7–1–101. Defendant Priest concluded that the Petition contained 17,262 valid signatures, which was 4,243 signatures short of the required 21,505.

3. This is a civil rights action brought by Plaintiffs against Sharon Priest in her capacity as Secretary of State, for federal violations of the First Amendment guarantees of freedom of speech and freedom of association, and the Fourteenth Amendment guarantee of equal protection and right of due process. Plaintiffs seek declaratory and injunctive relief and all other remedies available pursuant to 42 U.S C. §§ 1983 et seq., including attorney's fees.

4. Plaintiff Reform Party is an unincorporated voluntary political association of Arkansas citizens who seek to associate and express their political views through the party's access to the ballot as an officially recognized political party in the State of Arkansas.

5. Plaintiffs are qualified electors residing in the State of Arkansas. They signed the petitions at issue in this litigation.

6. Defendant Sharon Priest is the Secretary of State for the State of Arkansas and was at all times herein relevant acting, both personally and through the conduct of agents

and/or employees of the State of Arkansas, under the color of authority of her office as a state official to the unlawful detriment of Plaintiffs as hereinafter alleged. Defendant Priest is sued only in her official capacity.

7. The individual Plaintiffs believe Secretary of State Priest's action in denying ballot access to the Reform Party in the 1996 General Election has infringed their rights of freedom of speech and association and guarantees of equal protection and due process.

8. On November 3, 1992, H. Ross Perot ("Perot"), a candidate for the office of President: of the United States of America, received 10.4% or 99,132 of the votes cast in the general election in the State of Arkansas.

9. Because of Perot's showing in the 1992 general election, the Independent Party of Arkansas ("IPA") became a qualified political party pursuant to Ark.Code Ann. § 7–1–101($l$)(A).

10. In 1995 the IPA merged with a newly formed unincorporated voluntary political association, the Reform Party, for the purpose of forming a new political party—the Reform Party—in Arkansas.

11. On different occasions between November 2 and 9, 1995, Plaintiff Kraus met with Ann Purvis, Esq., counsel to Defendant Priest, to discuss procedures for conducting a petition drive to qualify a new political party and to work on the petition format and style. During these meetings Ms. Purvis commented several times as to the vagueness of the law pertaining to the formation of new political parties. Jacque Alexander is employed as Director of Elections for the Arkansas Secretary of State. In that capacity, she met with Plaintiff Kraus during January and February 1996. Ms. Alexander testified that she probably told Plaintiff Kraus that the laws for the formation of a new political party were vague.

12. The format of the Petition To Organize The Reform Party (the "Petition") was ultimately approved by Ms. Purvis.

13. In mid-November, 1995, Reform Party representatives and volunteers began the process of registering Arkansas voters and obtaining petition signatures on the Petition. Plaintiffs experienced a number of difficulties during the process of registering voters and obtaining petition signatures. Plaintiffs testified that the process of obtaining petition signatures was made more difficult by an early January deadline. They experienced difficulty collecting petition signatures in the winter time due to cold temperatures and inclement weather. Persons with whom they spoke indicated a lack of interest because of the holiday season. Potential signatories indicated a specific disinterest in politics so far in advance of the election. For example, Plaintiff Grommett testified to circulating petitions a minimum of 40 hours and having roughly 30% of the people he talked to tell him that it was too early to start talking about politics. Defendant Priest acknowledged that based on her personal experience, gathering petition signatures is a hard process. She acknowledged that voter apathy was a problem in the process.

14. By signing the Petition, Arkansas qualified electors expressed and declared their intention of organizing the Reform Party "to be placed on the ballot as a new political party in the State of Arkansas, and of participating in the November 4, 1996, general election."

15. Defendant Secretary of State Priest is the chief elections official for the State of Arkansas. In such capacity she is empowered by Ark.Code Ann. § 7–1–101 with the exclusive authority to recognize the formation of new political parties.

16. Pursuant to Ark.Code Ann. ¶ 7–1–101($l$)(A) a new political party may be officially recognized and qualified to participate in the next succeeding general election by filing with the Secretary of State a petition signed by qualified electors equal in number to at least 3% of the total vote cast for the office of Governor or nominees for presidential electors at the last-preceding election, and declaring their intention of organizing a political party. At all times pertinent herein, § 7–1–101($l$)(B) established a deadline for filing this petition as not later than 12:00 noon of the first Tuesday.in May before the preferential primary election for the general election in which the political party filing the petition desires to participate. In the cur-

rent election year that deadline was May 7, 1996.

17. Notwithstanding the deadline established by Ark.Code Ann. § 7–1–101(*l*)(B), at all times pertinent herein, § 7–7–203(g) established a deadline in this election year of January 2, 1996, for filing a petition with the Secretary of State for the purpose of forming a new political party. Thus, Arkansas statutes provided for two conflicting deadlines for filing a petition to form a new political party.

18. The Arkansas Supreme Court determined that deadline provisions in Ark.Code Ann. §§ 7–1–101(*l*)(B) and 7–7–203(g) are in utter conflict. *Citizens to Establish a Reform Party in Arkansas, et al v. Priest*, 325 Ark. 257, 264, 926 S.W.2d 432 (1996).[1]

19. Pursuant to Ark.Code Ann. § 7–7–203(g), January 2, 1996, was established as the deadline by which the Reform Party representatives were required to file the Petition in the office of the Secretary of State, containing at least 21,505 signatures of qualified Arkansas electors.

20. The Petition containing 28,546 signatures was filed with the Secretary of State by representatives of the Reform Party on January 2, 1996.

21. Thereafter, the Secretary of State proceeded with an audit of the Petition to determine whether the Petition contained at least 21,505 signatures of qualified Arkansas electors.

22. At various times after January 2, 1996, during the audit of the Petition by the Secretary of State, staff members of the Elections Division of the Secretary's office remarked to Reform Party representatives that the laws pertaining to new political party petitions were confusing.

23. Prior to issuance of the Secretary's decision on the sufficiency of the Petition, representatives of the Reform Party discussed with members of the Elections Division staff whether, in the event the Petition should be rejected, the Reform Party should be allowed 30 days in which to solicit and

obtain additional signatures, and/or submit proof to show that rejected signatures are good and should be counted. Notwithstanding Plaintiffs' request of the Secretary of State to be allowed an additional 30 days for this purpose, the Secretary refused, and continues to refuse, to allow Plaintiffs that opportunity.

24. Subsequent to February 16, 1996, Reform Party representatives conducted a partial review of Petition signatures that had been rejected by the Secretary of State. This review was conducted in large part with staff members of the Elections Division of the Secretary's Office. As a result of this review numerous errors were discovered of Petition signatures that were wrongfully rejected. Notwithstanding the discovery of wrongfully rejected signatures, the Secretary of State refused, and continues to refuse, to recognize these signatures as valid. The Arkansas statutes governing new political parties do not provide proponents with a statutory mechanism to either cure defective signatures or to submit evidence that the Secretary of State has wrongfully rejected signatures.

25. With regard to initiative and referendum petitions, Ark.Code Ann. § 7–9–111(d)(1) provides that if such petition is found to be insufficient, the Secretary of State shall notify the sponsors of the petition in writing of the reasons for such insufficiency. The sponsors shall then have 30 days within which to solicit and obtain additional signatures, submit proof to show that rejected signatures or some of them are good and should be counted, or make the petition more definite and certain. No such 30-day "cure" provision exists with regard to filing a petition for the organization of a new political party pursuant to § 7–1–101.

26. With regard to filing a petition to have one's name placed on the ballot as an independent candidate without political party affiliation for state office or for which a statewide race is required, Ark.Code Ann. § 7–7–103(c)(2) requires such person to file with the Secretary of State a petition containing signatures of 3% of the qualified electors of the

---

1. The Arkansas Supreme Court, after reviewing the legislative history and statutory scheme, found that the Legislature intended the earlier date of § 7–7–203(g) to apply.

state, or 10,000 signatures of qualified electors, whichever is the lesser. No such alternative signature mechanism exists with regard to filing a petition for the organization of a new political party pursuant to Section 7–1–101. In addition, Ark.Code Ann. § 7–7–103(e) provides that the sufficiency of any petition filed by an independent candidate may be challenged in the same manner as provided by law for election contests. Defendant Priest testified that new political parties should not be allowed an alternative signature mechanism "in order to keep order or process" and that some "arbitrary amount" must be established.

27. Pursuant to Ark.Code Ann. § 7–1–101($l$)(A), the only requirement as to the content or form of a petition to organize a new political party is that it state the name of the party and declare the intent of the signatories to organize such party and participate in the next succeeding general election. There are no statutory guidelines or requirements as to who, if anyone, must approve the petition, whether the petition must contain a circulator's verification under oath as to the qualified elector status of each signatory to the petition, and the procedure to be followed by the Secretary of State in verifying the petition signatures.

28. The petition filing deadline of January 2, 1996, established by Ark.Code Ann. § 7–7–203(g) is 4 1/2 months preceding the preferential primary election of May 21, 1996, and more than 5 months prior.to the general primary election of June 11, 1996, and 10 months preceding the general election of November 5, 1996. Under Arkansas statutory law, established political parties are required to hold their own general primary elections pursuant to Ark.Code Ann. § 7–7–202(a). The Arkansas Election Code also provides that a political party or group may select electors for President or Vice President of the United States by convention. Certification of the electors shall be filed with the Secretary of State by September 15th in the year of the election. Ark.Code Ann. § 7–8–302.

29. At issue in this action is the constitutionality of individual Arkansas statutes inhibiting ballot access as well as the combined effect of the Arkansas statutes inhibiting ballot access. Those statutes include Ark.Code Ann. §§ 7–7–203(g) and 7–1–101($l$)(A).

30. Allan J. Lichtman, Ph.D., an expert in minor political parties and political history, testified with regard to the unreasonably early filing deadline requirement of January 2, 1996, in Ark.Code Ann. § 7–7–203(g) Dr. Lichtman opined that the January 2nd deadline constitutes an unreasonable burden for emerging third party movements seeking to become qualified in the state. He stated that such an early deadline is not necessary to meet any of the state interests in regulating ballot access. Such an early date is not necessary in order to print ballots to conduct orderly and fair elections. It is not necessary to avoid ballot overcrowding or voter confusion or factionalism within the major parties.

Dr. Lichtman testified that the deadline is too early for a variety of reasons. It is too early because it is at the end of the prior election year and historically third parties do not develop until well into the election year. January is also a difficult time of year to gather petitions because of the holiday season and inclement weather. In addition, petition circulators have difficulty obtaining signatures several months before the primary elections and other significant political events and voters are not politically energized. Many public opinion polls show that people begin to make up the: their minds and focus on and understand the issues relatively late in the election period.

Furthermore, Dr. Lichtman testified that Arkansas' early deadline combined with the 3% requirement of Ark.Code Ann. § 7–1–101($l$)(A) is an unreasonable requirement for new political party petitions. A reasonable deadline is one that recognizes the historical development of third parties and also allows the state sufficient time to print ballots and conduct the mechanics of a general election. Many states have adopted deadlines in the summer of a general election year. He testified that over 2/3 of the states have ballot deadlines from May to September of the election year. Dr. Lichtman further noted that for ten years—from 1977 through 1987—Arkansas had the later date of May

for qualifying third parties. It has a May deadline for independent candidates to get on the ballot.

31. Richard Winger, another expert in third party ballot access testified regarding Arkansas' filing deadline as it compares to the statutory schemes in other states. There are many methods for Arkansas to provide for a later petition deadline and still protect its legitimate state interests. Mr. Winger testified that no group has successfully qualified as a political party since Arkansas has required the petition procedure. The last time an Arkansas general election ballot listed a third party candidate with a party label for any office other than the office of President was in 1970. Over the past twenty-five years, no other state has had an absence of non-presidential third party candidates on the general election ballot.

32. Dr. Lichtman testified that the alternative 10,000 petition signature requirement for independent candidates running for statewide office, as established by Ark.Code Ann. § 7–7–103(c)(2) serves the public interest. There is no justification for allowing the alternative signature requirement provision in one petition process but not the other. What amounts to a doubling of the political party signature requirement compared to the alternative independent candidacy signature requirement is unjustifiable, and that the alternative signature requirement constitutes a recognized lesser restrictive means whereby the state can satisfy its modicum of support interest.

33. The Court finds that the Reform Party is a political party rather than just a "pressure group."

34. The Court finds that plaintiffs were not dilatory in their efforts to obtain signatures.

## CONCLUSIONS OF LAW

1. This civil action seeking declaratory and injunctive relief is brought under the jurisdiction of 28 U.S.C. §§ 1331, and 1343, and 42 U.S.C. § 1983. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. There is now existing between the parties hereto an actual, justiciable controversy in respect to which Plaintiffs are entitled to have a declaration of rights and further relief, including permanent injunctive relief, because of the facts, conditions, and circumstances hereinafter set forth.

2. The Supreme Court of the United States has recognized repeatedly that the right to create a new political party derives from the First and Fourteenth Amendments and allows voters to enlarge their opportunities to express their political beliefs—that an individual's right to vote is heavily burdened if the individual can choose from only two parties when there are other parties demanding a place on the ballot—and, that the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and is denied an equal opportunity to win votes.

■ 3. Competition in ideas and governmental policies is at the core of the electoral process and of the First Amendment freedoms of speech and association. The right of individuals to associate for the advancement of their political beliefs and to create a new political party is a fundamental right guaranteed by the First and Fourteenth Amendments.

■ 4.

a. State laws, such as those herein at issue, that restrict a political party's access to the ballot implicate substantial voting, associational and expressive rights protected by the First Amendment.

b. A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that Plaintiffs seek to vindicate against the precise interest put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden Plaintiffs' rights. *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

c. Where, as here, such laws serve to bar recognition of a new political party

seeking ballot access, they must be narrowly drawn in the least restrictive means possible to advance a state interest of compelling importance. *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992).

■ 5. The individual statutory provisions set forth in §§ 7–7–203(g) and 7–1–101(1)(A) as well as the combined effect of the statutes place unreasonable burdens on Plaintiffs, and those burdens are sufficiently severe to violate Plaintiffs' rights under First Amendment guarantees of freedom of speech and freedom of association and Fourteenth Amendment guarantee of equal protection and the right to due process. In addition, the conflict between Ark.Code Ann. § 7–7–203(g) (January 2, 1996, deadline) and § 7–1–101(1)(B) (May 7, 1996, deadline) which existed as a matter of record at all times relevant to Plaintiffs' claims, renders the statutes unconstitutionally vague.

6. Plaintiffs have been irreparably harmed through violation of their constitutional rights by the actions of Defendant.

7. Plaintiffs have complied in all respects herein relevant with the requirements of Ark.Code Ann. § 7–1–101 for the formation of a new political party by petition.

8. Several fundamental rights have been impaired by the conduct of Secretary of State Priest. Such rights include Plaintiffs' right to create a new political party, the right to associate for the advancement of political beliefs, the right of candidates to run for office and the right to vote freely, effectively, and for the candidates of their choice. *Norman v. Reed,* 502 U.S. 279, 288–90, 112 S.Ct. 698, 705–06, 116 L.Ed.2d 711, 723 (1992); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974); *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211–12, 1 L.Ed.2d 1311 (1957); and *Eu v. San Francisco County Democratic Central Comm.,* 489 U.S. 214, 224, 109 S.Ct. 1013, 1020–21, 103 L.Ed.2d 271 (1989).

9. The Arkansas statutes at issue here, individually and in combination, place unreasonable burdens on Plaintiffs' ability to obtain ballot access. The United States Supreme Court has recognized that:

> [n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

*Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). Furthermore, the right to vote is interwoven with the freedom to associate to create a new political party in the context of ballot access restrictions:

> In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

*Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968).

10. The Supreme Court recently emphasized that for more than two decades it has recognized "the constitutional right of citizens to create and develop new political parties." *Norman v. Reed,* 502 U.S. at 288, 112 S.Ct. at 705. Noting the constitutional interest advanced by like-minded citizens gathering in pursuit of the creation of a new political party, the Supreme Court clearly enunciated the appropriate standard of review as follows: "To the degree that a state would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation, [citation omitted] and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance." *Id.* at 288–89, 112 S.Ct. at 705.

11. The burdens imposed by Arkansas' election code scheme in this instance are sufficiently severe to require the application of the strict scrutiny test. Indeed these

burdens on this record serve to bar altogether the recognition of a new political party in Arkansas. Therefore, the Arkansas statutes at issue must be examined to determine whether they are "narrowly drawn to advance a state interest of compelling importance." *Republican Party of Ark. v. Faulkner County, Ark.*, 49 F.3d 1289, 1299 (8th Cir.1995) (citation omitted). This Court must "not only determine legitimacy and strength of each of those interests, [we] also consider the extent to which those interests make it necessary to burden the Plaintiffs' rights." (Citation omitted.)

12. A review of Arkansas' election code demonstrates that the statutes individually and in combination place unreasonable and burdensome obstacles in the path of new political parties seeking ballot access. Those obstacles do not serve any compelling state interest or even any legitimate state interest, but rather serve to make unduly difficult the creation of a new political party in Arkansas.

13. Even the less rigorous "flexible, sliding-scale test" requires that this Court determine that the statutes at issue place unreasonable burdens on Plaintiffs' rights which are protected by the First and Fourteenth Amendments. The "flexible, sliding-scale test" requires this Court to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interest put forward by the state as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992).

14. With language appropriate to the issues presented by this case, the Supreme Court spoke eloquently of the historic struggle of minority parties to gain ballot access and the role of the Courts in protecting the core fundamental freedoms involved:

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot. In determining whether the State has power to place such unequal burdens on minority groups where rights of this kind are at stake, the decisions of this Court have consistently held that 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms.' *NAACP v. Button*, 371 U.S. 415, 438 [83 S.Ct. 328, 341, 9 L.Ed.2d 405].... [T]he Ohio system does not merely favor a 'two-party system'; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly. There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

*Williams v. Rhodes*, 393 U.S. 23, 31–32, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1968).

15. Unreasonably early petition filing deadlines have the effect of barring minor political parties from access to the ballot, thereby excluding new, competitive political viewpoints and candidates from the electoral process. Such deadlines have consistently been invalidated as unconstitutional by numerous Federal and State Courts. In *MacBride v. Exon*, 558 F.2d 443 (8th Cir.1977), Libertarian Party candidates for President and Vice President sought to compel the Nebraska Secretary of State to place their names on the ballot. To become a new political party for the 1976 general election, a petition had to be submitted to the Secretary of State's office with a certain number of signatures nine months prior to the general election. Applying strict scrutiny to determine whether the deadline was invalid, the Eighth Circuit stated:

Restrictive measures are constitutionally suspect, and if they are to pass constitutional muster, they must be reasonable and must be justified by reference to a compelling state interest. The measures adopted by a state may not go beyond what the state's compelling interests actually require, and broad and stringent restrictions or requirements cannot stand where more moderate ones would do as well.

*Id.* at 448. The court found that Nebraska failed to establish a compelling state interest for the challenged deadline. It agreed with the District Court's findings that a the deadline was an "arbitrary restriction upon the right of voters to vote for candidates of their choice." *Id.* at 448–449.

16. Early filing deadlines such as the one herein at issue unduly hinder, if not bar, minor political parties from influencing the electoral process by ballot access. Only in the election year itself do issues begin to coalesce such that minority parties with opposing or different views may emerge. At such an early point in the election year, it is often difficult to get volunteers from the voting public to become involved in the petition collection process. As noted by the court in *American Party v. Jernigan,* 424 F.Supp. 943, 949 (E.D.Ark.1977), the filing dates of either March or April in a general election year "would normally pass before any real political activity or interest therein could be expected." See also, *New Alliance Party v. Hand,* 933 F.2d 1568 (11th Cir.1991) (early deadline places significant burden on minor political parties because voters are disinterested any length of time before an election). It is also more difficult to get volunteers for the minor parties, to attract media coverage, and to attract financial support early in the process, which impacts the petition process, and, therefore, ballot access, as well. See *Anderson v. Celebrezze,* 460 U.S. at 780, 792, 103 S.Ct. at 1565, 1572. Even the influence of inclement weather is recognized as a rationale for finding early petition filing deadlines unconstitutional. *E.g., Libertarian Party of Oklahoma v. Oklahoma State Election Board,* 593 F.Supp. 118, 121–122 (W.D.Okla.1984) (inclement weather a hinderance to petition signature gathering, resulting in deprivation of constitutional rights).

17. Applying the *Anderson/Burdick* standards and the Eighth Circuit's analysis in *Republican Party of Arkansas v. Faulkner,* 49 F.3d 1289 (8th Cir.1995), to the instant case, it is clear that the January 2, 1996, deadline is unconstitutional. The character and magnitude of the injury to Plaintiffs is most severe in that it denies them ballot access through the formation of a new political party in Arkansas. In effect, it unreasonably prevents a minor political party from even forming. Therefore, a strict scrutiny standard of analysis applies, and it is incumbent upon Secretary of State Priest to establish both a compelling state interest in the January 2, 1996, deadline and that this deadline is the least restrictive means available by which to satisfy that interest. Based on the evidence presented, the Court finds that Secretary of State Priest has not established that the January 2, 1996, deadline satisfies the state's interest. Even under the more flexible sliding-scale test, Defendant cannot justify the unreasonably early deadline to satisfy a legitimate state interest.

18. Application of the test in *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) demonstrates that Ark.Code Ann. §§ 7–1–101(1) and 7–7–203(g) violate the Equal Protection Clause. In *Illinois State Board,* the court, in determining whether the Illinois elections law violated the Equal Protection Clause of the Fourteenth Amendment, looked at three elements: (1) the character of the classification; (2) the importance of the individual interests at stake; and (3) the state's asserted interests supporting the classification. 440 U.S. at 183, 99 S.Ct. at 989–90.

First, the Arkansas Legislature has arbitrarily chosen to apply both the same standard and a different standard for proponents who advance independent candidates in contrast to proponents who advance a new political party. On the one hand, both can demonstrate a satisfactory showing of support with a 3% signature requirement. On the other hand, an independent candidate for statewide office may, in the alternative, meet the re-

quirement with 10,000 signatures. Such an arbitrary classification makes it unreasonably difficult for proponents to advance new political parties while allowing independent candidates to be placed on the ballot with even less public support. Second, as discussed previously, ballot access and voters' interests in the political process constitute fundamental rights which this Court must review with the strictness of scrutiny. Third, the State cannot advance any compelling interest or rational basis supporting this discriminatory and arbitrary classification.

19. When examining the entire statutory scheme, it is important to evaluate the combined effect of the statutory requirements. *Republican Party of Ark. v. Faulkner*, 49 F.3d 1289 (8th Cir.1995). The combined effect of the early deadline in conjunction with the 3% requirement of Ark.Code Ann. § 7-1-101(1)(A) places an unreasonable burden of federally protected constitutional rights.

20. As to the last prong of the *Illinois State Board of Elections* test, the Supreme Court has recognized that states have an interest in limiting the size of the ballot, avoiding voter confusion, and protecting the integrity of the elections process. *Lubin v. Panish*, 415 U.S. 709, 714, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). These state interests are protected by requiring a certain number of signatures on a petition to demonstrate a modicum of public support. *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). However, if 10,000 signatures are sufficient to demonstrate a modicum of support for an independent candidate (Ark.Code Ann. § 7-7-103(c)(2)), then 10,000 signatures are also sufficient to demonstrate a modicum of support for a new political party, especially where the legislature has also established that a sufficient demonstration of a modicum of support is established in both instances by a 3% signature requirement. Proponents of a new political party in Arkansas must be afforded the corresponding opportunity to submit a finite number of signatures as an alternative to a percentage fixed by statute. Moreover, the finite number of signatures that should be allowed for the creation of a new political party should be the same as the finite number alternative established, by the Arkansas Legislature for an independent candidate, given the common fundamental rights involved in both instances.

21. The Arkansas Legislature's unequal treatment of the procedures required for demonstration of support of a new political party and corresponding provision for an independent candidate constitute a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Secretary of State Priest is, therefore, enjoined from enforcing Ark.Code Ann. §§ 7-1-101(1) and 7-7-203(g), and Plaintiffs are deemed to have qualified as a new political party in view of the 17,262 signatures validated by Secretary of State Priest on February 16, 1996.

■ 22. Statutes are considered vague when "[people] of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964); *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). A statute found to be vague will be held unconstitutional because it violates due process of law. *Baggett*, 377 U.S. at 367, 84 S.Ct. at 1320. In *Hynes v. Mayor of Oradell*, 425 U.S. 610, 621–22, 96 S.Ct. 1755, 1761–62, 48 L.Ed.2d 243 (1976), the Supreme Court noted that there are three ways in which a statute can be unconstitutionally vague: (1) the statute is unclear; (2) the statute does not clearly outline what conduct is required; or (3) the statute gives public officials unreviewable discretion in enforcing the statute due to a "lack of standards."

■ 23. The standard of review for vagueness is especially strict where, as on the instant record, constitutionally protected freedoms are involved. As the Supreme Court stated in *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 281, 7 L.Ed.2d 285 (1961):

The vice of unconstitutional vagueness is further aggravated where ... the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution.... '[S]tricter

standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect or speech;...'
Quoting, *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959). The application of a stringent vagueness test was more recently described by the Supreme Court in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982):

> The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment.... [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. *If, for example, the law interferes with the right of free speech or association, a more stringent vagueness test should apply.*

(emphasis added). *See generally, Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1487 (6th Cir.1995) (more stringent vagueness test applies where law interferes with right of free speech); *LaRouche v. Kezer*, 787 F.Supp 298, 304 (D.Conn.1992) (vague statute "not reasonably necessary to achieve the state's interest in regulating ballot access"); *Duke v. Connell*, 790 F.Supp. 50 (D.R.I.1992) (statute governing selection to primary ballot unconstitutionally vague for purpose of ballot access).

24. This Court has previously found Arkansas elections statutes to be "too vague and indefinite to be enforced" where, as in this case, there were two alternative filing deadlines at issue. *American Party v. Jernigan*, 424 F.Supp. 943, 949. In decisions of this Court not involving ballot access, vague laws are described as "those which turn on language calling for the exercise of subjective judgment, unaided by objective norms." *Rockefeller v. United States*, 572 F.Supp. 9, 15 (E.D.Ark.1982).

25. Applying the foregoing review standards to the statutory scheme at issue, one thing is clear—the statutes require the exercise of subjective judgment, without the help of any objective norms, as to their meaning

and scope of application. This is evident in all three areas of potential infirmity cited by the Supreme Court in *Hynes v. Mayor of Oradell, supra*, 425 U.S. at 621–22, 96 S.Ct. at 1761–62. *See also, Duke v. Connell, supra*, 790 F.Supp. at 54. First, during the time frame herein at issue, the coverage of Ark.Code Ann §§ 7–1–101(1)(B) and 7–7–203(g) was unclear. The Arkansas Supreme Court subsequently determined that the statutes were in "utter conflict." *Citizens to Establish a Reform Party in Arkansas v. Priest*, 325 Ark. 257, 264, 926 S.W.2d 432 (1996). Second, the statutes fail on their face to adequately specify what petition proponents of a new political party must do in order to comply, and in attempting to comply, such proponents must necessarily guess at their meaning. Finally, Ark.Code Ann. § 7–1–101(1)(A) permits Secretary of State Priest to exercise unbridled and unreviewable discretion in her determination of the sufficiency of the new political party petition.

26. The statutes herein at issue are void for vagueness and therefore unconstitutionally applied

27. The imposition by Defendant of the aforesaid statutes violates Plaintiffs' rights to freedom of speech and freedom of association guaranteed by the First Amendment to the United States Constitution, and Plaintiffs' rights to equal protection and due process under the Fourteenth Amendment.

28. Plaintiffs have no adequate remedy at law. Plaintiffs have been irreparably harmed through the violation of their constitutional rights. Therefore,

(a) This Court declares the actions of the Secretary of State in rejecting the Plaintiffs' efforts to create a new political party to be contrary to and in violation of the First and Fourteenth Amendments to the United States Constitution;

(b) This Court declares the statutes herein at issue to be, both on their face and as applied to Plaintiffs, in violation of the First and Fourteenth Amendments;

(c) A permanent injunctive order is issued against Defendant Secretary of State Priest, to the effect that she officially

recognize tie formation of the Reform Party pursuant to Ark.Code Ann. § 7-1-101;

(d) A permanent injunctive order is issued against Defendant Secretary of State Priest, to the effect that Plaintiffs be allowed ballot access for the general election this November 1996 and that the Reform Party may select its candidates for office by convention; and of its nominees for local, state, and national office by convention; and

(e) This Court hereby awards Plaintiffs their costs and reasonable attorney's fees under 42 U.S.C. § 1988.

IT IS SO ORDERED.

EXHIBIT F

CUDDY & LANHAM

ATTORNEYS AND COUNSELORS AT LAW

470 EVERGREEN WOODS

BANGOR, MAINE 04401

KEVIN M. CUDDY

SAMUEL W. LANHAM, JR.

DORIS A. HARNETT

PAMELA D. CHUTE

MARGARET T. CAMPBELL

WAYNE P. DOANE

JOHN P. BURUBE

July 20, 1996

Angela Jegley, Esq.
Sr. Assistant Atty. Gen.
323 Center Street, Suite 200
Little Rock, AR 72201-2610

Re: Citizens to Establish a Reform Party in Arkansas, et al. v. Sharon Priest

File No.: 4189

Dear Angela:

This is to confirm that we received last evening an unsigned draft of the Defendant's Trial Brief. We did not receive any Proposed Findings of Fact and Conclusions of Law. Nor did we receive, as had been promised, written confirmation of Dr. Wildgen's final opinions, and the basis therefor, as he indicated in his deposition last Tuesday, July 16, he was still in the process of developing. Nor did we receive the exhibit maps to be referred to by Dr. Wildgen.

Dr. Lichtman did receive, this morning, several Arkansas data files from Dr. Wildqen. Dr. Lichtman has entered the files into his system and read them. Each file includes several variables, some with a large number of variables, organized according to geographic unit; in Arkansas.

These variables are identified only by a brief code name. No other description is provided. In some instances, the code names seem obvious. In other instances, however, the code name is unintelligible. As a result, it would take considerable inference and guess work to analyze this data appropriately. This can likely be rectified by having Dr. Wildgen promptly fax to Dr. Lichtman precise definitions of the variables. This information should be readily available to whoever created or is using the data. Dr. Lichtman's fax number is (301)530-4792. It should be noted that this is the same information that was requested this past Thursday, July 18 in what I referred to as the "Code Book". Please kindly contact Dr. Wildgen and have this information faxed directly to Dr. Lichtman today.

We have tried to call you several times this morning, both on your direct line number and the general office number to convey this information, but there has been no answer. I will be in my office this afternoon until 3:00 p.m. EST. If you do not fax the items referenced in the initial paragraph above by then, please fax the material or have it hand-delivered to the Capital Hotel in Little Rock tomorrow.

Very truly yours,

/s/ Samuel W. Lanham, Jr.
Samuel W. Lanham, Jr.

SWL:lem

cc: G. Alan Perkins, Esq. (Via Fax)

EXHIBIT G

July 20, 1996

Facsimile 207–941–8818

Mr. Sam Lanham

Attorney at Law

470 Evergreen Woods

Bangor, Maine 04401

Re: *Citizens to Establish a Reform Party in Arkansas, et al. v. Sharon Priest*

Dear Sam:

I have received your letter dated July 20, 1996. Let me point out the following in response to your letter: First, if you will remember, when you called yesterday, I told you that I was in the process of writing the trial brief and had put the written correspondence to you to the side. However, I did confirmed in our conversation the opinions that Dr. Wildgen would offer and the substance of his opinions as previously identified in my letter to you dated July 12, 1996. You questioned Dr. Wildgen extensively during his deposition concerning his opinions and the supporting factual basis. As you will recall, you asked during his deposition on Tuesday, July 17, 1996 what specific indicators would support his opinions and he responded fully. In addition, you were offered during his deposition hard copies of the maps that he had prepared to that point, an offer of which you did not avail yourself. Furthermore, during the deposition, Dr. Wildgen made plain what methodology he was using as well as the supporting databases. No request was made however, for the data until Thursday, July 18, 1996. You were told on Thursday that the form in which the data were requested by your first letter on that date was non-secure, but that the information would be forwarded by Fed–Ex to Dr. Lichtman for Saturday delivery. Your second letter dated February 18, 1996, which I did not see until the morning of July 19, 1996 asked for the data in yet another form. You were told yesterday, July 19, 1996 that the form in which the data were requested was non-trivial and that the data were being sent in a best-practice format.

Further, let me point out that your own clients have the Secretary of State's voter registration database and have had this information in their possession literally for months. Finally, the other data is readily available from other public sources. No alchemy is involved, I also point out that Lichtman has referred in his own deposition testimony to the 1990 census, which leads one to believe that he has this information in his possession as well or has access to it.

I have made a good faith effort to comply with your requests despite the fact that none of the information you have requested was requested in formal discovery at any time. I will indeed furnish to you copies of the maps as soon as I have them. I do not have physical access to them at this point otherwise I would have sent them to you at once. It is my understanding that there were some technical difficulties on this point. Since we are preparing for trial of our case, this is my final word or the issue of databases.

I sent the facsimile draft trial brief to you last night at 12:30 a.m., our time and notified you at that time that the substance of the brief is final, although there will be cosmetic changes to the form and that the rest of the materials that are due you, including the proposed findings of fact and conclusions of law will be sent as quickly as possible. I was, frankly at the end of my physical limits when the brief was sent. But, in light of the content of our trial brief, it should be clear to you what our proposed findings of fact and conclusions of law are. There are no surprises. I will have a packet of material waiting for you at the Capitol Hotel.

Let me close by saying that there have been situations in which both of us have been unable to keep our commitments to furnish particular information on a specific schedule. It is my view, and I believe you will agree, that we have worked remarkably well together as professionals. We are, and have been, on an expedited schedule. It is my hope that short tempers won't interfere with the task at hand. Once again, I am working without the benefit of support staff, thus, this letter is not on letterhead.

Sincerely,

/s/Angela S. Jegley

Angela S. Jegley

Senior Assistant Attorney General