*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0342p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LIBERTARIAN PARTY OF OHIO; JASON HALLMARK;
DENA BRUEDIGAM; PATRICK J. FRIEDRICH,
  *Plaintiffs-Appellants,*

 v.

J. KENNETH BLACKWELL, in His Official Capacity as
Ohio Secretary of State,
  *Defendant-Appellee.*

No. 04-4215

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00008—Gregory L. Frost, District Judge.

Argued: September 14, 2005

Decided and Filed: September 6, 2006

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Gary Sinawski, New York, New York, for Appellants. Arthur James Marziale, Jr., OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Gary Sinawski, New York, New York, Donald J. McTigue, Columbus, Ohio, for Appellants. Arthur James Marziale, Jr., OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

GIBBONS, J., delivered the opinion of the court. CLAY, J. (pp. 14-19), delivered a separate opinion concurring in part and dissenting in part. GRIFFIN, J. (pp. 20-26), delivered a separate dissenting opinion.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. The Libertarian Party of Ohio ("LPO"), its chairperson, vice-chairperson, and a member who sought to be listed as a candidate appeal the district court's order denying their motion for summary judgment and granting summary judgment in favor of defendant J. Kenneth Blackwell, the Secretary of State of Ohio ("Secretary" or "State"). The LPO's first claim is that Ohio's policy mandating strict compliance with election laws violates the Constitution. As we find this claim to be moot, we do not have jurisdiction to address it. The

LPO's second claim, which is not moot, is that the combination of two Ohio election regulations – the requirement that all political parties nominate their candidates via primary election and the requirement that all minor political parties file a petition with the Secretary 120 days in advance of the primary – imposes an unconstitutional burden on its First and Fourteenth Amendment rights of free association, by effectively preventing it from gaining access to the general election ballot in the twelve months preceding a presidential election. Following the analytical framework set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and its progeny, we find that the combination of these two requirements imposes a severe burden on the constitutional rights of the LPO, its members, and its potential voter-supporters. As the regulations are not narrowly tailored and do not advance a compelling state interest, Ohio's system for registering new political parties violates the Constitution. Thus, we reverse the ruling of the district court.

## I.

This case presents a conflict between the constitutional rights of minor political parties and the authority of a state to regulate its elections and ensure the state's relevance in the modern presidential election cycle. As the nominees of the "major" political parties[1] become known earlier in the election year, states have pushed back the dates of their primary elections to the beginning of the primary election cycle. Over the last twenty-five years, the primary date in Ohio in presidential election years has moved from the first Tuesday in June to the first Tuesday in March. *Compare* Ohio Rev. Code § 3501.01(E)(2) *with Anderson*, 460 U.S. at 783 n.1 (citing the code section in effect in 1980). As a result, the date by which a political party must file to qualify for the primary also has moved, from the end of March in the year of the election to the beginning of November in the preceding year. *See* Ohio Rev. Code § 3517.012. The issue in this case is whether the move to accommodate the major parties has placed an impermissible burden on the constitutional rights of minor parties, including the LPO, and the supporters of these minor parties.

The Ohio Constitution requires that all political parties, including minor parties, nominate their candidates at primary elections. Ohio Const. Art. V, § 7. By statute, primaries are held the first Tuesday after the first Monday in May, except in presidential election years, when the primaries are held the first Tuesday after the first Monday in March. Ohio Rev. Code § 3501.01(E)(1)-(2). The 2004 primaries were held on March 2 of that year.

Ohio law provides two methods by which a party can qualify for the primary election. Any party that, in the preceding state election, receives at least five percent of the vote for its candidate for governor or president automatically qualifies for the next statewide election.[2] Ohio Rev. Code § 3517.01(A)(1). All other parties must file a petition no later than 120 days prior to the date of the primary election that contains the number of signatures equal to one percent of the total votes cast in the previous election – 32,290 in 2004. *Id.* A party that does not file a petition by this date cannot participate in the primary and is thus prevented from appearing on the general election ballot. To be on the ballot for the November 2, 2004 general election, minor parties like the LPO were required to submit a petition no later than November 3, 2003.

---

[1] Throughout this opinion, the Republican and Democratic parties will be referred to as the "major" political parties. All other political parties will be known as "minor" political parties. Judge Griffin correctly notes that the language of Ohio Rev. Code § 3517.01 makes no distinction between "major" and "minor" political parties. However, as will be discussed in Part III.A.1, the practical effect of the state's election law has been to limit the rights of parties other than the Republican and Democratic Parties from appearing on the general election ballot, making them the de facto "major" parties.

[2] In Ohio, the election for governor occurs in even-numbered years in which there is no presidential election.

On October 30, 2003, the LPO filed a Petition to Form a Political Party, containing the requisite number of signatures, with the Secretary. In a letter dated November 24, 2003, the Secretary informed the party that the petition was invalid because it did not include the correct election falsification notice. The required notice had been changed by state statute in August 2001, but the LPO continued to use an older form, with the previous version of the notice.[3] When the Secretary rejected the petition, the LPO had no time to obtain signatures on the proper form in advance of the filing deadline. The LPO thus failed to qualify as a political party and was unable to participate in the March 2, 2004, primary election. As a result, the party and its candidates were prohibited from appearing on the ballot for the 2004 general election.

On January 6, 2004, the LPO filed suit under 42 U.S.C. § 1983, claiming a violation of the rights guaranteed under the First and Fourteenth Amendments and seeking declaratory and injunctive relief. On January 15,the LPO moved for a preliminary injunction that would (1) direct the state to accept the party's petition, (2) invalidate the state's early filing deadline so that the LPO could file a new petition, or (3) invalidate Ohio's requirement that the LPO nominate its candidates by primary and permit it to nominate through party caucus or convention. On February 5, the district court denied the motion by reason of laches but did not rule on the constitutional claims. On June 1, the LPO and the State filed cross-motions for summary judgment. The court granted the State's motion and denied the LPO's motion. The LPO filed a timely appeal.[4] We review a district court's grant of summary judgment de novo. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996).

II.

Our first duty is to determine whether the completion of the election has deprived this court of jurisdiction. Though neither party raises the issue of mootness, a federal court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties, where the relief requested would have a real impact on the legal interests of those parties. *See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992); *McPherson v. Mich. High School Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc). If "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," then the case is moot and the court has no jurisdiction. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979). "The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss." *McPherson*, 119 F.3d at 458.

An exception to the mootness doctrine exists for wrongs that are "capable of repetition, yet evading review." *See Rosen v. Brown*, 970 F.2d 169, 173 (6th Cir. 1992) (quoting *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514 (1911)). This doctrine applies when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration and (2) there is a reasonable expectation or a demonstrated probability that the controversy will recur. *See Honing v. Doe*, 484 U.S. 305, 318-19 n.6 (1988). The first prong of this test is easily satisfied. Legal disputes involving election laws almost always take more time to resolve than the election

_____

[3] The notice currently required by Ohio law reads: "Whoever commits election falsification is guilty of a felony of the fifth degree." Ohio Rev. Code § 3501.38(J). The form used by petitioner contained the notice required prior to August 2001: "The penalty for election falsification is imprisonment for not more than six months, or a fine of not more than one thousand dollars."

[4] The LPO also appealed the district court's denial of its post-judgment motion seeking to rectify its earlier failure to file a motion for summary judgment as a separate document. In denying the motion, the district court noted that it had already construed the LPO's memorandum in support of summary judgment as a motion for summary judgment and had addressed the merits of the motion. In any event, the LPO has not mentioned the order denying the post-judgment motion in its brief and thus has abandoned its appeal from it.

cycle permits.  *See Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *Lawrence v. Blackwell*, 430 F. 3d 368, 371 (6th Cir. 2005).  In the present case, less than eleven months elapsed between the filing of the lawsuit and the occurrence of the election, and future challenges will face the same problem.

Whether the issues in this case satisfy the second prong, however, is a more complex question that requires separating the two categories of claims brought by the LPO.  The first challenges the Ohio requirement that election laws must be strictly complied with, unless the statute expressly states otherwise.  *See State ex rel. Vickers v. Summit County Council*, 777 N.E.2d 830, 835 (Ohio 2002); *State ex rel. Comm. for the Referendum of Lorain Ordinance No. 77-01*, 774 N.E.2d 239, 249 (Ohio 2002); *see also* Ohio Rev. Code § 3517.011.  This dispute arose because the election falsification notification contained on the LPO's petition did not follow the exact wording required by Ohio law.  The attempted justification for the LPO's non-compliance, however, does not lead this court to reasonably expect that the LPO or other political parties will encounter this same injury in the future.  In August 2001, the Ohio legislature changed the election falsification notice that is required on a political party petition form.  The LPO alleges that it began distributing its petition form in April 2001, before the change took effect, and thus, its forms contained the old notification.  When the LPO presented its petition in November 2003, it was rejected for containing the improper notice.  Outside of this unique factual situation, there is not a reasonable expectation or demonstrated probability that the LPO or any other political group will be injured by Ohio's requirement of strict compliance with election laws.  The capable of repetition exception does not apply, and the issue of the constitutionality of the strict compliance standard is moot.

On the other hand, it is likely that the LPO will once again seek to place candidates on the general election ballot in 2008.  As a result, the party again will face the requirements that its candidates be selected in a March primary and that it file a petition for party recognition 120 days in advance of this primary.  Considering the "somewhat relaxed" repetition standard employed in election cases, *see Lawrence*, 430 F.3d at 372, this issue easily satisfies the "capable of repetition, yet evading review" exception and is not moot.  *See also Norman v. Reed*, 502 U.S. 279, 287-88 (1992).

III.

We therefore turn to the merits of the second issue – whether the combined effect of the Ohio election laws being challenged impermissibly burdens the plaintiffs' rights to free speech and association under the First Amendment.[5]  When analyzing the statutes, we are cognizant that "the state laws place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."  *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters.") (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).  The right to cast an effective vote "is of the most fundamental significance under our constitutional structure."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  The rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon.  *See California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views.").

---

[5]Judge Griffin's opinion criticizes the "somewhat relaxed" repetition standard used in election cases.  The standard, as noted above, is the law of this circuit.

This does not mean, however, that all state restrictions on political parties and elections violate the Constitution. The Supreme Court has clearly stated that states "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). Thus, voting regulations are not automatically subjected to heightened scrutiny. The Supreme Court has set forth the appropriate analytical framework in *Anderson*, 460 U.S. 780, and *Burdick*, 504 U.S. 428. First, the court looks at the "character and magnitude of the asserted injury" to petitioner's constitutional rights. *Anderson*, 460 U.S. at 789. The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* If petitioner's rights are subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But if the state law imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights, then the interests of the state in regulating elections is "generally sufficient to justify" the restrictions. *Id.* (quoting *Anderson*, 460 U.S. at 788).[6]

A.

The first step under the *Anderson/Burdick* framework[7] is to determine whether this burden on the associational rights of political parties is "severe." In order to accurately apply this test, we must first determine the exact nature of the burden placed upon minor political parties and their voter-supporters. The LPO challenges the Ohio regulations that: (1) mandate that parties not meeting the five percent vote threshold in the previous election file a petition 120 days in advance of the primary election in order to qualify; and (2) require that parties participate in the March primary in order to appear on the general election ballot. Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights. *See Williams*, 393 U.S. at 34.

Many courts have documented the burden imposed by statutes requiring political parties to file registration petitions far in advance of the primary and general elections. *See, e.g.*, *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 880 (3d Cir. 1997) ("*Hooks I*") (noting that an April deadline – 60 days in advance of the primary – required minor parties to rally support "when the election is remote and voters are generally uninterested in the campaign"); *Citizens to Establish a Reform Party of Ark. v. Priest*, 970 F. Supp. 690, 697-98 (E.D. Ark. 1996) (concluding that a January deadline prevented minor parties from finding volunteers, attracting media coverage and recruiting supporters, all of which impacted its ability to appear on the ballot); *McLain v. Meier*, 637 F.2d 1159, 1163-64 (8th Cir. 1980) ("*McLain I*") (same – June deadline 90 days in advance of primary). Deadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. In this case, the LPO needed to find more than thirty thousand Ohio residents to sign its

---

[6] Following the analytical framework set forth by the Supreme Court, "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on a number of [the Court's] prior election cases relying on the Equal Protection Clause of the Fourteenth Amendment." *Norman*, 502 U.S. at 288 n.8 (quoting *Anderson*, 460 U.S. at 786-87 n.7).

[7] The analytical approach we undertake is identical to that employed in *Lawrence*, 430 F.3d at 372. The restriction in *Lawrence*, a requirement that independent candidates file the day before the primary, did not impose a severe burden. Therefore, the *Lawrence* court correctly did not apply strict scrutiny. There is no tension between this case and *Lawrence*.

petition to appear on the 2004 ballot more than one year in advance of the election.[8] Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party. The combination of these burdens impacts the party's ability to appear on the general election ballot, and thus, its opportunity to garner votes and win the right to govern. The LPO's argument, thus, is that the ballot-access restrictions resulting from the filing deadline one year in advance of the general election imposes a severe burden on the First Amendment rights of the party, its members, and its potential voter-supporters.

1.

The role of this court is not to impose our own idea of democracy upon the Ohio state legislature; rather, we must limit our analysis to whether the restrictions imposed on the registration of minor political parties fits within the outer limits of what the First Amendment requires. At the same time, we realize that the State may not be a "wholly independent or neutral arbiter" as it is controlled by the political parties in power, "which presumably have an incentive to shape the rules of the electoral game to their own benefit." *Clingman v. Beaver*, 544 U.S. 581, 125 S. Ct. 2029, 2044 (2005) (O'Conner, J., concurring). Thus, though the court's role in reviewing election regulations is limited, it is also vital in that it protects interests that may not be adequately represented in the political process.

In determining the magnitude of the burden imposed by a state's election laws, the Supreme Court has looked to the associational rights at issue, including whether alternative means are available to exercise those rights; the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the state relative to the scope of the election.

The key factor in determining the level of scrutiny to apply is the importance of the associational right burdened. Restrictions that do not affect a political party's ability to perform its primary functions – organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election – have not been held to impose a severe burden. For example, the Supreme Court upheld Minnesota's "anti-fusion" law, which prohibits an individual from appearing on the ballot as the candidate for more than one party. *Timmons*, 520 U.S. at 354. In refusing to apply strict scrutiny, the Court noted that the law did "not restrict the ability of the [party] and its members to endorse, support, or vote for anyone they like," *id.* at 363, nor did it "exclude[] a particular group of citizens, or a political party, from participation in the election process." *Id.* at 361. The Court emphasized that the party was still "able to use the ballot to communicate information about itself and its candidates to the voters, so long as that candidate is not already someone else's candidate." *Id.* at 363. As a result, any burden imposed was minimal and justified by the important state interest in avoiding voter confusion and minimizing problems with the election process. *Id.* at 363-64. *See also Burdick*, 504 U.S. at 436-37 (refusing to apply strict scrutiny to Hawaii's statute prohibiting write-in votes because the many different routes for gaining access to the ballot in the state made the burden a "very limited one"). The Court recently followed *Timmons* in upholding an Oklahoma statute that allows only registered members of the party and registered independents to vote in a primary election. *Clingman*, 125 S. Ct. at 2039. Again noting that the statute in no way limited a political party's access to the ballot or to choose and vote for its own candidate, the Court held that such "minor barriers between voter and party do not compel strict scrutiny." *Id.*; *see also Schrader v. Blackwell*, 241 F.3d 783, 790-91 (6th Cir. 2001) (upholding a law that prevents independent candidates from being associated with a political party on the ballot if the party has not qualified under state law).

---

[8] The fact that the LPO met this requirement does not affect our analysis. *See infra* Part III.A.2.

As noted above, however, the statutes at issue in this case do not merely affect the rights of the LPO to associate with non-members or select a certain candidate to be its standard-bearer. Certainly, both of these interests are implicated, but Ohio's regulations limit a far more important function of a political party – its ability to appear on the general election ballot. In cases analyzing restrictions on ballot access, the Supreme Court

> focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.

*Anderson*, 460 U.S. at 793 (quoting *Clements v. Fashing*, 457 U.S. 957, 964 (1982) (plurality opinion) (internal quotation marks and other citations omitted)). The Court has consistently noted the fundamental interest of citizens to create and develop new political parties. "To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, [the Court has] called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation . . . ." *Norman*, 502 U.S. at 288-89 (internal citation omitted). "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group." *Anderson*, 460 U.S. at 793. The Court thus has applied strict scrutiny in striking down laws that required an independent candidate for President to register in March, seventy-five days before a June primary, to appear on the November ballot, *id.* at 806, and a law that imposed a burdensome signature requirement on a party wishing to appear on the ballot in a local election, *Norman*, 502 U.S. at 294.

The ability of a political party to appear on the general election ballot affects not only the party's rights, but also the First Amendment rights of voters. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) (noting the fundamental importance of "[t]he right to associate with the political party of one's choice"). It is true that a voter does not have an absolute right to vote for a candidate of her choice, especially when that candidate or party has not complied with reasonable state regulations. *See, e.g.*, *Burdick*, 504 U.S. at 441-42 (upholding prohibition on write-in votes due largely to the ease of gaining access to the state's ballot); *Timmons*, 520 U.S. at 354 (limiting a candidate to representation of one political party); *Schrader*, 241 F.3d at 786. However, when a candidate wishes to appear as one party's standard-bearer and voters want to exercise their constitutional right to cast a ballot for this candidate, the Court has viewed state-imposed restrictions on this fundamental process with great skepticism.

> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates – and of particular importance – against those voters whose political preferences lie outside the existing political parties.

*Anderson*, 460 U.S. at 793-94. While a voter is not guaranteed that one of the political parties will reflect his or her values, "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Williams*, 393 U.S. at 31; *see also Anderson*, 460 U.S. at 787. "In short, the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties." *Anderson*, 460 U.S. at 794.

The evidence in the record shows that in Ohio, elections have indeed been monopolized by two parties, and thus, the burdens imposed by the state's election laws are "far from remote." *Jones*, 530 U.S. at 578. In *Jones*, the Supreme Court noted the importance of evidence that the burden imposed was a "clear and present danger" and not merely the product of speculation. *Id.* The LPO

has put forth evidence showing that Ohio is among the most restrictive, if not the most restrictive, state in granting minor parties access to the ballot. Of the eight most populous states, Ohio has had by far the fewest minor political parties on its general election ballot. From 1992-2002, the other states in this group averaged four minor political parties on the ballot each year. J.A. 58. In contrast, Ohio averaged one per year, and no minor political parties qualified for the ballot, in any race, in 1992, 1994, 2002 and 2004. This is a product of not only the primary requirement and filing deadline, but also of the laws providing for automatic party qualification.

In addition, of the seven states that require all political parties to nominate their candidates in the state's primary election, Ohio imposes the most burdensome restrictions of both automatic qualification and petition qualification; as a result, it has seen the fewest number of minor parties on the ballot. California is the only other state with a filing deadline more than a year before the general election; however, its qualification requirements are much lower than Ohio's, and the state had seven political parties automatically qualify for the ballot in 2004.[9] *See* Declaration of Richard Winger, App. F, J.A. 81-83. The same is true of Mississippi, which has a January filing deadline, but requires only that a party certify a list of statewide party officers in each of the state's four congressional districts in order to qualify. It, too, had seven ballot-eligible political parties in 2004.[10] *Id.* Ohio had no minor political parties on its 2004 ballot. *Id.* at 3, J.A. 58. Forty-three other states, including Texas, New York, Illinois and Pennsylvania, permit minor political parties to nominate their candidates via convention or petition and provide far more flexibility in the date by which a party must qualify. *Id.* at App. F, J.A. 81-83. While not conclusive in and of itself, the Supreme Court has noted that a historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality. *Storer*, 415 U.S. at 742; *see also Jones*, 530 U.S. at 578.

Put simply, the restrictions at issue in this case serve to prevent a minor political party from engaging in the most fundamental of political activities – recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately, the right to govern. The evidence in the record indicates the negative impact these laws have had on minor parties and on political activity as a whole in Ohio. As such, we find that the Ohio system for registering minor political parties imposes a severe burden on associational rights.

In so ruling, we follow the great weight of authority that has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections. Our court has recently noted this distinction in upholding an Ohio statute requiring an independent candidate to file a registration petition the day before the state's primary election. *Lawrence*, 430 F.3d at 375. The court in that case explicitly distinguished cases in which courts had found that deadlines far in advance of the primary election imposed a severe burden on the rights of political parties, candidates, and voters. *See id.* at 374 n.2. Two district courts within this circuit have also utilized strict scrutiny in striking down early filing deadlines. *See Libertarian Party of Ky. v. Ehrler*, 776 F. Supp. 1200, 1205-06 (E.D. Ky. 1991) (January deadline, 119 days

---

[9] California's primary in 2004 was also on March 2, and its filing deadline was 135 days in advance (end of October 2003). California, though, makes it far easier for minor parties to qualify. The party must poll 2% in *any* statewide race in a gubernatorial election year, and no vote test applies in presidential years. The party must also keep its registration membership above one-fifteenth (1/15) of one percent (1%) of the state total. J.A. 83.

In contrast, only one minor party has automatically qualified under Ohio law – the Reform Party, with Ross Perot as its candidate, in 1996. Running as independent candidates, Perot in 1992 and John B. Anderson in 1980 also surpassed the five percent threshold. *See* "Election Results," Ohio Secretary of State, *at* http://www.sos.state.oh.us/sos/ElectionsVoter/electionResults.aspx (last visited March 20, 2006).

[10] Only four other states require minor political parties to nominate their candidates in a primary election; all four have filing deadlines in April or later. J.A. 83-84.

before the primary); *Cripps v. Seneca County Bd. of Elections*, 629 F. Supp. 1335, 1338 (N.D. Ohio 1985) (February deadline for independent candidates, 75 days before the primary).

Our sister circuits have also found filing deadlines well in advance of the election date to be unconstitutional because of the restrictions such laws place on the ability of the party or candidate to appear on the ballot. In examining Alabama's April deadline for minor parties, the Eleventh Circuit ruled that the burden imposed was not "insurmountable" but that "[n]o one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the [general] election is required to advance legitimate state interests." *New Alliance Party of Ala. v. Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991). The law in that case required filing a petition 60 days in advance of the primary election. *Id.* at 1571. The Eighth Circuit has encountered this issue on at least three occasions, striking down Nebraska's February deadline, which was 90 days ahead of the primary, *MacBride v. Exon*, 558 F.2d 443, 449 (8th Cir. 1977), and North Dakota's June deadline, which was 90 days before the primary, *McLain I*, 637 F.2d at 1164. When later faced with the amended North Dakota law, the court upheld the state's April deadline on the basis that it was only 55 days ahead of the primary and the state had significantly reduced the signature requirement to 7,000. *McLain v. Meier*, 851 F.2d 1045, 1050-51 (8th Cir. 1988). The Third Circuit faced a similar situation, striking down New Jersey's April deadline, which was 54 days before the primary, *Hooks I*, 121 F.3d at 883, but upholding the amended statute that imposed a June deadline, one day in advance of the state's primary, *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 77-78 (3d Cir. 1999).

A number of other courts have noted the problems associated with filing deadlines far in advance of the election. In evaluating Arkansas's January deadline, one district court noted that "[e]arly filing deadlines . . . unduly hinder, if not bar, minor political parties from influencing the electoral process by ballot access. Only in the election year itself do issues begin to coalesce such that minority parties with opposing or different views may emerge." *Priest*, 970 F. Supp. at 698. The court thus analyzed the law under strict scrutiny and found it unconstitutional. *Id.* The court in *Stoddard v. Quinn* followed the same logic in finding that Maine's April 1 deadline, more than two months ahead of the primary election, imposed an unconstitutional burden on the parties' First Amendment rights. 593 F. Supp. 300, 304-05 (D. Me. 1984). On the other hand, both the Fourth and Fifth Circuits have upheld laws that required parties to file registration petitions only the day before the state's May primary election. *Fishbeck v. Hechler*, 85 F.3d 162, 165 (4th Cir. 1996); *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 185 n.4 (5th Cir. 1996) (distinguishing a deadline to declare an intention to run in January from the actual filing deadline in May). *See also Rainbow Coal. of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 747 (10th Cir. 1988) (upholding May 31 deadline, 55 days in advance of primary election).

We find both the reasoning and the conclusions of these courts to be compelling. Ohio's deadline in the November preceding the election is the earliest of any deadline reviewed by a federal court. It is 120 days in advance of the primary election and 364 days ahead of the general election for which the party wishes to appear on the ballot. This deadline imposes a severe burden on the First Amendment rights of the LPO.[11]

2.

The State makes several arguments that the burdens imposed by the regulations are not severe.

---

[11] In non-presidential election years, primaries are held the first week in May, and thus the filing deadline is in January, ten months in advance. Ohio Rev. Code § 3501.01(E)(1)-(2). This deadline is 120 days in advance of the primary and still ten months ahead of the general election. This case, however, involves a challenge only to the laws' application in a presidential election year. We make no ruling on the laws' application in non-presidential election years.

The first contention is that the laws place no limit on key First Amendment rights of recruiting new members and engaging in political speech. We find this argument unpersuasive. First, the laws in question may indeed place limits on these other associational rights. The requirement that a fledgling political party rally support more than a year in advance of an election, when the major party candidates are not known and the majority of the country is not focused on the election, is an exceedingly difficult task. This easily could mute the party's message and limit its ability to recruit new members. *See Priest*, 970 F. Supp. at 697-98. Even if the statutes leave some associational rights unimpeded, this is not sufficient to establish that no burden is imposed. The Supreme Court has noted that a statute affecting key First Amendment rights does not become less burdensome because it does not limit all associational rights. *See Jones*, 530 U.S. at 581 ("We have consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired.").

Moreover, the rights left unimpeded by the Ohio regulations are not the ones most central to the goals of a political party. Recruiting members and engaging in political speech are important rights, but a political party's aims are far higher. The LPO does not aspire simply to assemble in public meeting places and engage in speech activities that further their beliefs. Certainly, this is a cherished First Amendment right and one that is jealously guarded. But the *goal* of a political party and its supporters is to govern. *See Schrader*, 241 F.3d at 789 ("A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office.") (quoting *Storer*, 415 U.S. at 745). A party cannot lead if not elected and cannot be elected if not on the ballot. As the Supreme Court stated thirty years ago, "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot . . . ." *Williams*, 393 U.S. at 31. The statutes at issue in this case affect the ability of a political party to appear on the ballot and thus to exercise its most fundamental of rights.

Next, the State notes that Ohio law permits a candidate of a minor political party to appear on the ballot without participating in the primary election. To do so, a candidate need only file a nominating petition 75 days prior to the general election (August 18 in 2004), and he or she will be listed without party affiliation – as an independent or under "Other Party." *See* Ohio Rev. Code § 3513.257; *Anderson*, 460 U.S. 806 (striking down the previous law setting the deadline as 75 days before that year's *primary* election). This argument also misses the mark. Political parties, especially for national elections, aim to gather members together under a common title and common ideological beliefs. On many ballots, the option of a "straight-ticket" vote is even available, which allows an individual to mark one box that automatically selects the candidates from one of the major parties. Thus, in many cases party affiliation has the same, if not more, importance than the identity of the candidate. The Supreme Court has noted that "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other." *Storer*, 415 U.S. at 745. A candidate's appearance without party affiliation is not a substitute for appearing under a party name, and it does not lessen the burden imposed by Ohio's restrictions on minor parties.

The State's final argument is that the LPO filed its petition ahead of the deadline, only to have it rejected on procedural grounds. The fact that the LPO could comply with all of the requirements, and had done so in the past, the State contends, is evidence that the burden imposed is not severe. We find this argument equally unpersuasive. First, it ignores the fact that the early deadline prevented the party from re-filing a petition on the correct form, because the deadline had passed. Moreover, the fact that an election procedure can be met does not mean the burden imposed is not severe. *See Anderson*, 460 U.S. at 791 n.12. A party is not required to intentionally forfeit its place in the political arena in order to challenge an election law.

We make one additional observation about the State's arguments.  The State analyzes the burdens imposed by the challenged statutes separately, rather than addressing their collective impact. For example, it argues that *Jones*, 530 U.S. at 572, is controlling on the question of whether states may require political parties to nominate their candidates in a primary election.  Putting aside the issue of whether *Jones* actually stands for this proposition, such reliance misses the point.  The LPO does not challenge the primary requirement alone, but rather in combination with the 120-day filing deadline.  It is this combined burden on the party's rights that we must address.

The State has not convinced us that the burden imposed by the filing deadline and primary requirement is not severe.  There are few greater burdens that can be placed on a political party than being denied access to the ballot.  In this case, the combination of the laws challenged by the LPO acted to impose just such a burden.  We hold that the combination of Ohio laws that require a political party to file a registration petition twelve months in advance of the general election in order to appear on the ballot imposes a severe burden on the First Amendment rights of the LPO and its potential voter-supporters.  As such, any regulation of this right "must be narrowly drawn to advance a state interest of compelling importance."  *Burdick*, 504 U.S. at 434.

### B.

The State has made no clear argument regarding the precise interests it feels are protected by the regulations at issue in the case, relying instead on generalized and hypothetical interests identified in other cases.  Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment rights.  *See Reform Party of Allegheny County v. Allegheny County Dep't of Elections*, 174 F.3d 305, 315-16 (3d Cir. 1999) (citing *Anderson*, 460 U.S. at 789); *cf. Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (ruling that courts cannot "supplant the precise interests put forward by the State with other suppositions" in evaluating restrictions on commercial speech under the *Central Hudson* test).  In the interest of a full and fair review, however, we have mined the State's brief and argument to identify its proffered rationales for the primary requirement and filing deadline. To determine if these interests are compelling, we examine each "in the circumstances of this case."  *Jones*, 530 U.S. at 584 (emphasis omitted).

The State argues that a filing deadline 120 days in advance of the primary election allows a reasonable amount of time to process a petition for the registration of a political party.  In that 120 days, the State must certify the signatures on the petition; allow for administrative appeals; print, distribute, and proof ballots; and prepare and mail absentee ballots.  It is true that a 120-day period may be a reasonable amount of time to process the registration of a political party; however, this is not the inquiry before us.[12]  Rather, we must examine whether mandating that this 120-day period take place in advance of a March primary, resulting in a filing deadline one year in advance of the general election, promotes a compelling state interest.  We find it does not.

The primary interests asserted by the State include preserving the integrity and fairness of the electoral process and ensuring that minor parties given access to the ballot have established bona fide support.  Both the Supreme Court and this court have recognized the viability of these interests, *see Timmons*, 520 U.S. at 363-64; *Lawrence*, 430 F.3d at 375, but the State has provided no evidence that its registration procedure for minor parties in any way protects these interests.  The State makes no argument that a filing deadline one year in advance of the general election is needed to ensure electoral fairness, and it would be difficult to do so.  Forty-eight states have filing deadlines for minor parties later in the election cycle, and forty-three states allow minor parties to nominate candidates in a manner other than the primary election.

---

[12]Though we need not rule on this issue, the great weight of authority from other circuits indicates that a filing deadline 120 days in advance of the primary may fall short of being even a reasonable state interest. *See supra* Part III.A.1 (discussing cases from other courts).

The State also asserts an interest in regulating the number of candidates in order to promote political stability, encourage compromise that limits the number of candidates with short-range goals, and avoid voter confusion. Again, the State has put forth no evidence that these interests are compelling or that they are advanced by the early filing deadline. There is some question as to whether this rationale is even reasonable. A state may not legitimately claim that preventing other parties from accessing the ballot is needed to protect political stability. The deadline in this case serves only to prevent the registration of new political parties unless those parties can mobilize more than a year before the election in which they wish to run. This system serves to protect the two major parties at the expense of political dialogue and free expression, which is not justified, much less compelling. *See Anderson*, 460 U.S. at 804; *Williams*, 393 U.S. at 31-32.

Moreover, the regulations arguably have a negative effect on limiting short-range candidates and preventing voter confusion. Political parties are organizations with short and long-term political objectives, as well as a desire for continuity and growth. By making it more difficult for parties to access the political arena, the state actually *increases* the possibility that issue-specific independent candidates will emerge to fill this void.[13] These candidates do not offer the stability of a political party, and the sheer number leads to a greater likelihood of political instability and voter confusion. The State has made no showing that the voters of Ohio, who are able to cast an effective ballot featuring several independent candidates, would be flummoxed by a ballot featuring multiple political parties.

Finally, it is important to note that the state's interests in regulating an election cannot trump the national interest in having presidential candidates appear on the ballot in each state. In the context of the presidential election, "state-imposed restrictions implicate a uniquely important national interest." *Anderson*, 460 U.S. at 794-95 (footnote omitted). Strict ballot access requirements imposed by states have an impact beyond their own borders, placing some limits on a state's prerogative to regulate its elections. Moreover, as opposed to state or local elections, the outcome of a presidential election largely will be determined by voters outside a state's borders, reducing the importance of the state's administrative concerns. The combination of restrictions in this case "does more than burden the associational rights of . . . voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process." *Anderson*, 460 U.S. at 795.

Moving the filing deadline closer to the date of the primary or allowing parties to choose their candidates in another manner may impose some additional costs on the state, but this is the price imposed by the First Amendment. Ohio is well within its authority to mandate primary elections, to limit all parties to one primary date, or to require filing a petition in advance of the primary for administrative purposes. Viewed individually, each of these requirements may only impose a reasonable burden on constitutional rights. In practice, however, the combination of these laws imposes a severe burden on the associational rights of the LPO, its members, and its potential voter-supporters. As the State has not shown that these laws are narrowly tailored to protect a compelling state interest, we find that the Ohio system for minor party qualification violates the First Amendment of the Constitution.

---

[13] In the 2004 election, the Ohio ballot contained thirteen independent candidates. In 2002, eleven independent candidates were on the state ballot. These numbers are totals from the presidential, gubernatorial, congressional and state legislative races. They do not include write-in candidates, of which there were many. *See* "Official Election Results," Ohio Secretary of State, *at* http://www.sos.state.oh.us/sos/ElectionsVoter/electionResults.aspx (last visited March 20, 2006).

IV.

There is an inherent constitutional tension between the rights of states to conduct and regulate elections and the rights of political parties and voters to exercise their First Amendment rights. We do not presume to dictate how Ohio must run its elections, except to say that the system must fall within the outer boundaries established by the Constitution. The filing deadline and primary requirement challenged by the LPO, when viewed in combination, fall outside these constitutional limits.

For these reasons, we reverse the judgment of the district court.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

CLAY, Circuit Judge, concurring in part and dissenting in part.  I agree with Judge Gibbons that the combined burden from Ohio's petition deadline and primary election cycle unconstitutionally burdens minor political parties seeking to qualify candidates for the Ohio general election ballot.  I therefore join that portion of Judge Gibbons' opinion which addresses this issue.  I write separately because I believe that Plaintiffs' complaint that Ohio's strict compliance rule unconstitutionally burdens First Amendment freedoms is not moot.  Ohio's rejection of Plaintiffs' petition on highly technical grounds presents significant constitutional questions about the electoral process that this Court should address on the merits.

**I.**

**BACKGROUND**

Plaintiffs sought to qualify the Libertarian Party as a "minor political party" under Ohio law in time for the 2004 presidential election cycle.  This qualification would have enabled the Libertarian Party candidates to hold a primary to nominate a presidential candidate and to list the candidates' party affiliation on election ballots.  To qualify, Plaintiffs had to file a petition containing the signatures of at least 32,290 Ohio voters with the Ohio Election Commission by November 3, 2003.

Beginning in April 2001, Plaintiffs began circulating a petition to garner the necessary signatures.  On October 30, 2003, Plaintiffs filed a petition containing 57,150 Ohio voter signatures.  By letter dated November 24, 2003, Defendant rejected Plaintiffs' petition because the petition was not on the form prescribed by Defendant and did not contain the correct election falsification notice.  Ohio law requires strict compliance with all election requirements, unless another standard is specifically set forth by statute.  *See State ex rel. Citizens for Responsible Taxation v. Scioto County Bd. of Elections*, 602 N.E.2d 615, 617 (Ohio 1992).

Ohio Revised Code § 3517.011 provides that the petition "shall be on a form prescribed by the secretary of state."  In addition, Ohio Revised Code § 3501.38(J) requires that "[a]ll declarations of candidacy, nominating petitions, or other petitions under this section shall be accompanied by the following statement in boldface capital letters: WHOEVER COMMITS ELECTION FALSIFICATION IS GUILTY OF A FELONY OF THE FIFTH DEGREE."  More generally, § 3501.38 sets forth requirements for petitions filed with the Secretary of State.  That section states, in pertinent part:

> (B) Signatures shall be affixed in ink. Each signer may also print the signer's name, so as to clearly identify the signer's signature.
>
> (C) Each signer shall place on the petition after the signer's name the date of signing and the location of the signer's voting residence, including the street and number if in a municipal corporation or the rural route number, post office address, or township if outside a municipal corporation. The voting address given on the petition shall be the address appearing in the registration records at the board of elections.

Ohio Rev. Code § 3501.38.

Plaintiffs' petition did not contain the above-referenced election falsification notice as it currently exists in the Ohio code.  Rather, Plaintiffs' petition contained the form of the notice that

was in force prior to August 28, 2001, on which date the Ohio legislature changed the penalty for election falsification from a misdemeanor of the first degree to a felony of the fifth degree. *See State ex rel. Vickers v. Summit County,* 987 Ohio St. 3d 204, 208 (2002). Plaintiffs' notice read: "THE PENALTY FOR ELECTION FALSIFICATION IS IMPRISONMENT FOR NOT MORE THAN SIX MONTHS, OR A FINE OF NOT MORE THAN ONE THOUSAND DOLLARS." (J.A. at 16.) In addition, Plaintiffs' petition was not on the exact form promulgated by the Ohio Secretary of State. Plaintiffs' form differed in two ways. First, the "Circular Statement," whereby the circulator of the petition attests to the petition's validity, is before the signatures on the Plaintiffs' form, whereas the Secretary of State's form has this statement at the end of the signatures. Second, the Plaintiffs' form has three additional columns, one for the signatory to print his last name, and two columns for the signatory to indicate his ward and precinct. The forms are the same in all other respects, and all information called for on the Secretary of State's form is included on the Plaintiffs' form. Plaintiffs point out that their form provides a space for the signer to print his last name, as expressly permitted by Ohio Revised Code § 3505.38(B) ("Each signer may also print the signer's name, so as to clearly identify the signer's signature."), something that would be difficult to do on the Secretary of State's form, which does not provide a space. Plaintiffs also aver that they began circulating the petition in April 2001, four months *prior* to the change in law that modified the election falsification notice; therefore, when Plaintiffs began their petition drive the election falsification notice on their petition form was correct.

## II.

## ANALYSIS

### A.        Plaintiffs' Strict Compliance Claim Presents Significant Issues in Election Law

Plaintiffs assert significant issues in connection with Ohio's strict compliance requirement. Plaintiffs claim that the rejection of their petition on such technical grounds unconstitutionally burdens their speech and associational rights by unnecessarily restricting access to the Ohio ballot. Ohio's interests in a regular and orderly election process would be readily met, Plaintiffs argue, by requiring substantial compliance with election laws in lieu of the system of strict compliance that Ohio now employs. The Libertarian Party avers that the party's petition subverted Ohio election law requirements neither substantively nor procedurally and should have been accepted by the state. Plaintiffs point out that the formatting changes did not significantly alter the petition form, and that the out-dated election falsification notice served the state's purpose in informing potential violators of the significant criminal penalty for election fraud. Under Plaintiffs' analysis, when the consequence for such *de minimis* errors is so complete and far-reaching – a complete bar to ballot access and the concomitant impact on the associational interests of the party's potential voters – the burden on constitutional rights exceeds the marginal interest of the state in a strict, versus substantial, compliance system. Moreover, Plaintiffs assert that strict compliance presents unique concerns when employed in the context of party qualifying petitions. Major political parties do not need to submit such petitions, having qualified for the ballot through their demonstrated ability to garner votes in past election cycles. Only minor political parties seeking access to the Ohio ballot are required to submit a qualifying petition, and therefore only minor political parties can be kept off the ballot for *de minimis* errors in their petitions.

Plaintiffs' allegations represent serious concerns with the Ohio election system. These concerns deserve treatment on their merits by a full panel of this Court. Moreover, a decision on the merits of Plaintiffs' strict compliance claim would serve the interests of everyone involved by reducing any uncertainty as to the constitutionality of Ohio's election regime as the state moves forward toward the next election cycle. This review is within our power, because, contrary to the majority's assertion, Plaintiff's strict compliance claim is not moot.

**B.          Plaintiffs' Strict Compliance Claim Is Not Moot**

There are at least three ways in which Plaintiffs' injury is "capable of repetition:" 1) the Libertarian Party could (a) once again begin circulating a petition prior to a change in election law, causing a significant number of signatures to be invalid because they are not on a form either prescribed by the Secretary of State or containing the correct election falsification language as of the date of submission, or (b) make a different, yet similar, clerical mistake that Ohio law does not forgive; 2) the individual Plaintiffs, in their capacity as electors, could experience the same restriction in electoral choice as a result of the Secretary of State's use of Ohio's strict compliance requirement to reject a minor party's petition in the future; and 3) another minor political party may make the same mistake as the Libertarian Party in the instant case, experiencing the same injury as the Libertarian Party.

*1.          Mootness Jurisprudence*

This Court has a continuing obligation to address only live controversies. If "the issues presented are no longer live or parties lack a legally cognizable interest in the outcome," then the case is moot and the Court must dismiss. *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979). An exception to the mootness doctrine exists for wrongs that are "capable of repetition, yet evading review." *See Moore v. Ogilvie,* 394 U.S. 814, 815 (1969). Generally, a wrong is "capable of repetition, yet evading review" when (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation or a demonstrated probability that the controversy will recur. *Honig v. Doe*, 484 U.S. 305, 318-19 n.6 (1988); *see also Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). There is no dispute that the election cycle is too short a duration to enable election-law disputes to be fully litigated during that time period. *See Ogilvie*, 394 U.S. at 815; *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2006) ("Challenges to election laws are one of the quintessential categories of cases which usually fit within [the evading review] prong . . . .").

The Supreme Court clarified what it takes to show a "reasonable expectation" that the wrong will recur in *Honig,* 484 U.S. at 319-20. The *Honig* Court held that a 20-year old who was no longer enrolled in the California public school system, but who remained eligible for educational services through his 21st birthday, presented a non-moot challenge to the state's implementation of the Education of the Handicapped Act. *Id.* The Court expressly rejected the proposition put forth by dissenting Justice Scalia that a "reasonable expectation" was equivalent to a "demonstrated probability." *Id.* at 320 n.6. Instead, the Court looked at its past jurisprudence and concluded that it had found "controversies capable of repetition based on expectations that, while reasonable, were hardly demonstrably probable." *Id.* The Court went on to note that "[o]ur concern in these cases, as in all others involving potentially moot claims, was whether the controversy was *capable* of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." *Id.* (emphasis in original).

This Court has recognized that a "reasonable expectation" is something less than "more probable than not." *See Lawrence*, 430 F.3d at 371 ("The Supreme Court has stated that the purpose of the second prong is to determine 'whether the controversy was capable of repetition and not . . . whether the claimant has demonstrated that a recurrence of the dispute is more probable than not.'" (quoting *Honig*, 484 U.S. at 319 n.6)). In *Lawrence*, this Court found that there was a "reasonable expectation" that a candidate for a now-past election would wish to run as a candidate in future elections, despite no assertions in the record of any intent to do so. *Id.* Other circuit courts of appeals also follow the Supreme Court's direction that a "reasonable expectation" is something less than a demonstrated probability. *See Russman v. Bd. of Educ.*, 260 F.3d 114, 120 (2d Cir. 2001); *Miller ex rel. NLRB v. Calif. Pac. Med. Ctr.*, 19 F.3d 449, 454 (9th Cir. 1994); *Reich v. Local 30,*

*Int'l Bhd. of Teamsters*, 6 F.3d 978, 985 n.8 (3d Cir. 1993); *ACLU v. The Florida Bar*, 999 F.2d 1486, 1496 (11th Cir. 1993); *Hernandez v. Cremer*, 913 F.2d 230, 233-34 (5th Cir. 1990).

> 2.          *There Is a Reasonable Expectation That Plaintiffs Will Make the Same, or Similar,*
> *Mistakes in the Future*

In the instant case, the Libertarian Party failed to include the up-to-date election falsification notice on its petition and altered the Secretary of State's version of the petition in order to include more information. There is no evidence in the record, nor do the circumstances suggest, that the Libertarian Party made these mistakes in a deliberate attempt to challenge Ohio's strict compliance with election laws requirement. Rather, the mistakes were merely that – mistakes. And these mistakes occurred despite the fact that the Libertarian Party has a decades-long history of organization and demonstrated ability to field presidential candidates, at least on some states' ballots. The majority opinion concludes that the Libertarian Party is unlikely to make the same mistake in the future with the incorrect election falsification notice and therefore that Plaintiffs have failed to show a "reasonable expectation" that the wrong will recur. This conclusion rests on unreasonably high expectations of the Libertarian Party's competence and construes the issue too narrowly.

If the Libertarian Party, despite its relative sophistication in comparison to other minor political parties, inadvertently made not one, but at least two mistakes on its petition for the 2004 presidential election cycle, then it is reasonable to believe that the party will make an error on a petition in the future. Obviously, the party's nationwide and statewide organizational capabilities did not prevent the mistakes in this past election cycle. The personnel that populate the organizational apparatus of a political party's machine are often, by necessity, seasonal. Moreover, many political workers are volunteers, and turnover is frequently high. To say that the Libertarian Party is unlikely to make a mistake on the petition form in the future is to ascribe perfect organizational memory to the organization's members. The instant case is unlike prior cases in which the courts have said that we will not usually assume that a party will deliberately violate the same law in the future. *See Honig*, 484 U.S. at 320. This is not a matter of willful violation, but rather inadvertent mistake. It is entirely reasonable to expect that the Libertarian Party may submit an imperfect petition in the future.

Finally, Plaintiffs ask this Court to decide whether "Ohio's requirement that petition forms comply strictly with applicable statutes" unconstitutionally burdens Plaintiffs' First and Fourteenth Amendment rights. (Pl. Br. 2.) While in the instant case the strict compliance requirement resulted in the petition's rejection as premised on the election falsification language and the form modification, in the future the Libertarian Party may make similar, although not identical, mistakes. Therefore, even were the Libertarian Party's organizational memory perfect insofar as the election falsification notice goes, there are many other ways in which the Libertarian Party could submit an imperfect petition that the Secretary of State may reject pursuant the Ohio Revised Code § 3517.011 (requiring all petitions to be on the form prescribed by the Secretary of State). Plaintiffs may very well remember to double check the election falsification language in the future. They may even remember not to include additional columns for the inclusion of what the party considers useful information. It is reasonable to expect, however, that similar, if not identical, mistakes will be made in future petitions. It is unclear, for example, whether the inclusion of additional columns and the movement of the circulator statement would have resulted in the rejection of Plaintiffs' petition in the instant case, if the election falsification notice were not in issue. Certainly, as argued by the state of Ohio, the Secretary of State would have been within his authority to reject the petition for such mistakes because the petition was not on the form as prescribed by the Secretary. A future circulator may, for example, move the circulator statement to the start of the second page in order to fit page formatting requirements of a computer program. If this issue is moot in the instant case, the courts

are endowing Ohio's Secretary of State with plenary, unreviewable authority to determine whether a petition is on the properly prescribed form.

This Court has every reason to believe that the Libertarian Party will continue their long tradition in Ohio of attempting to qualify candidates for the ballot. In argument to this Court, Ohio insists on its strict compliance requirement and its application to the election falsification notice and the form of the petition. There is every reason to believe that Ohio will continue to reject any petition which does not precisely conform to its requirements. This Court should have a reasonable expectation that the Libertarian party will suffer the same fate with respect to a future petition.

3.    *There Is a Reasonable Expectation That in Their Capacity as Electors, the Individual Plaintiffs May Be Deprived of Electoral Choices in the Future Due to Ohio's Strict Compliance Requirement*

The individual Plaintiffs also sue in their individual capacity as electors "who want to support and vote for the political party plaintiff and its candidates." (J.A. at 6.) Ohio maintains its adherence to strict compliance with its election laws. Given the possibility that the Libertarian Party, *see supra*, and other minor political parties, *see infra*, will make a mistake on a petition and be refused a spot on an Ohio ballot, there is a reasonable expectation that, as electors, the same "complaining parties" will be deprived of electoral choices in the future. Therefore, insofar as the individual Plaintiffs sue as electors, and not candidates, the strict compliance requirement issue is not moot. *Compare Corrigan v. Newaygo*, 55 F.3d 1211, 1213-14 (6th Cir. 1995) (finding a challenge to a local election ordinance not moot with respect to the two voter-plaintiffs, who complained of a restriction in their electoral choices), *with Speer v. City of Oregon*, 847 F.2d 310, 312 n.3 (6th Cir. 1988) (finding the case moot when the plaintiff sued only as a candidate and not as a voter).

4.    *There Is a Reasonable Expectation That Other Minor Political Parties Will Make the Same or Similar Mistakes in the Future*

Normally, the "capable of repetition, yet evading review" exception to mootness requires that the dispute be capable of repetition between the same parties, *i.e.*, "there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Weinstein*, 423 U.S. at 149. Yet the Supreme Court, this Court, and several of this Court's sister circuits have relaxed the same party requirement in the election law context, and looked instead to whether there is a reasonable expectation that the same type of plaintiff may suffer a similar injury in the future:

> The fact that the controversy almost invariably will recur with respect to some future potential candidate or voter in Ohio is sufficient to meet the second prong because it is somewhat relaxed in election cases. Courts have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future.

*Lawrence*, 430 F.3d at 372.

Despite its history of successful compliance with Ohio's election laws, the Libertarian Party included the incorrect election falsification notice on its October 2003 petition and improperly modified the Secretary of State's petition form, both of which provided grounds for the rejection of the party's more than 57,000 collected signatures. It is reasonable to expect that other minor political parties, many not as experienced as the long-standing Libertarian Party, will make similar mistakes in the future. Variations on the Ohio petition form can very easily happen through inadvertence. Moreover, Ohio's requirement that the petitions be "on the form prescribed" by the Secretary of State is not completely unambiguous. Computer programs reproduce such forms for

widespread dissemination. A less well informed volunteer may very easily make formatting changes to make the petition easier to read, reproduce, or distribute and still believe that the resulting petition is "on the form prescribed" by the state. In the instant case, the Libertarian Party merely added three columns and moved the circulator statement in order to enable the election falsification notice to appear on the same page as the signatures. The party seems to have believed that the petition was still "on the form prescribed" by the state. But as the instant case demonstrates, the party was wrong. There is, therefore, a reasonable expectation that a similarly situated party will make the same, or similar, mistake as that made by the Libertarian Party in the 2004 election cycle and run afoul of Ohio's strict compliance requirement.

## III.

## CONCLUSION

There is a reasonable expectation that the Libertarian Party or some other minor political party will be refused access to the Ohio ballot in the future because of arguably *de minimis* errors in their party petition. Plaintiffs present significant concerns about the burden placed on First Amendment freedoms by Ohio's insistence on strict compliance with its petition requirements, concerns which should have been treated on the merits by this Court. I therefore respectfully dissent from the majority's conclusion that the strict compliance issue is moot.

------------------------

**DISSENT**

------------------------

GRIFFIN, Circuit Judge, dissenting.  I join in section II of Judge Gibbons' opinion, except for its final paragraph.  With regard to the other portions of her opinion, I respectfully dissent.

In addition, I note my disagreement with Judge Clay's characterization of the petition warning error as "technical" or "de minimis."  Starting August 28, 2001, Ohio law required that nominating petitions warn all potential circulators and signatories, in boldface capital letters, that "WHOEVER COMMITS ELECTION FALSIFICATION IS GUILTY OF A FELONY OF THE FIFTH DEGREE."  Ohio Rev. Code § 3501.38(J).  The LPO's petitions signed after August 28, 2001, contained only the following *misdemeanor* warning:  "THE PENALTY FOR ELECTION FALSIFICATION IS IMPRISONMENT FOR NOT MORE THAN SIX MONTHS, OR A FINE OF NOT MORE THAN ONE THOUSAND DOLLARS."  In my view, the difference in punishment between a felony and a misdemeanor is neither "technical" nor "de minimis."

In 2004, if the state of Ohio unconstitutionally denied a political party access to its ballot, such a party remains hypothetical:  it has not been identified and its plight has not been chronicled in this record.  The only political party at issue in this case is plaintiff Libertarian Party of Ohio ("LPO").  But, the ballot qualifying requirements that the majority deems "severe" and declares unconstitutional were fulfilled by the LPO in 2004.  In fact, the challenged regulations that require the filing of nominating petitions 120 days in advance of the primary election and participation in the primary election were complied with by the LPO, not only in 2004, but also in two preceding elections.  The only reason that plaintiff LPO did not qualify for Ohio's ballot in 2004 was an error with regard to its petitions signed after August 28, 2001.  If not for this serious petition error, the LPO would have been on the 2004 Ohio ballot.  Because this legal error is the sole reason plaintiff LPO was denied ballot access in 2004, and because this mistake is unlikely to reoccur, I would dismiss this case as moot.  U.S. CONST. art. III, § 2; *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990).

We lack jurisdiction over moot cases because the jurisdiction of federal courts is limited to actual and ongoing cases or controversies.  As the Supreme Court stated in *Lewis*, 494 U.S. at 477-78:

> Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. *Deakins v. Monaghan*, 484 U.S. 193, 199, 108 S. Ct. 523, 528, 98 L. Ed. 2d 529 (1988); *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S. Ct. 2330, 2334, 45 L. Ed. 2d 272 (1975).  To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision, *Allen v. Wright*, 468 U.S. 737, 750-751, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-473, 102 S. Ct. 752, 757-59, 70 L. Ed. 2d 700 (1982).  Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them," *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413 (1971), and confines them to resolving "'real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  *Ibid.* (quoting *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S. Ct. 461, 464, 81 L. Ed. 617 (1937)).  This case-or-controversy requirement subsists through all stages of federal judicial

proceedings, trial and appellate.  To sustain our jurisdiction in the present case, it is not enough that a dispute was very much alive when suit was filed, or when review was obtained in the Court of Appeals.  *Deakins, supra*, 484 U.S. at 199, 108 S. Ct. at 528; *Steffel v. Thompson*, 415 U.S. 452, 459, n.10, 94 S. Ct. 1209, 1216, n.10, 39 L. Ed. 2d 505 (1974).  The parties must continue to have a "'personal stake in the outcome'" of the lawsuit, *Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962)).

In effect, Judge Clay would relegate the constitutionally-based mootness doctrine to "the dustbin of history."  Cf. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 97 n.2 (1989) (Scalia, J., dissenting).  Under his analysis, the doctrine would cease to exist because the federal courts would always have jurisdiction due to a possibility that a similarly situated party might arise, and raise at some future time, a substantially similar issue.  His views on mootness are contrary to the plain wording on our limit of jurisdiction contained in Article III, Section 2.

Judge Gibbons correctly rejects Judge Clay's notion of mootness with respect to the first issue, but inconsistently appears to follow it with regard to the second issue.  Her only offered justification is that, in election cases, the courts should apply a "somewhat relaxed repetition standard" in deciding whether the Constitution deprives federal courts of jurisdiction.  In my view, we should not construe the provisions of our Constitution in a "strict" manner or in a "somewhat relaxed" manner.  Rather, it is our role to ascertain and give effect to the plain and original meaning of the words used in our Constitution.  ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997).  *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J., concurring), and *South Carolina v. United States*, 199 U.S. 437, 448 (1905).

Judge Gibbons also makes a half-hearted argument that perhaps were it not for the early filing deadline, the LPO might have been able to obtain a new set of 32,290 signatures after its petitions were rejected.  No evidence supports this supposition.  Deadlines are deadlines, whether they are "early" or "late."  Customarily, nominating petitions are filed at or near the filing deadline, and time is then afforded for the Secretary of State to accept or reject the form of the petitions and for the local boards of elections to verify the number and authenticity of the signatures.  In the present case, the LPO filed its petitions on October 30, 2003, only days before the November 3, 2003, deadline.  In a letter dated November 24, 2003, the LPO was notified by defendant that its petitions were rejected as invalid because they did not contain the felony warning required by Ohio law.  These facts contradict the lead opinion's conjecture and speculation regarding the possibility of the LPO's ability to recirculate its petitions.

Regarding the arguable merits of this speculative dispute, the majority erroneously subjects the disputed Ohio election regulations to a strict scrutiny analysis which, in turn, compels the majority to rule the laws unconstitutional.  Because the challenged election rules are a reasonable non-discriminatory use of Ohio's regulatory power, I would follow the rationale of *Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005), *cert. denied*, — U.S. —, 126 S. Ct. 2352 (2006), and uphold the laws as constitutional.

Recently, in *Clingman v. Beaver*, 544 U.S. 581 (2005), the Supreme Court emphasized that not all election regulations that burden First Amendment rights are subject to a strict scrutiny analysis.  Rather, unless a state election regulation places a heavy or severe burden on a party, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."  *Id*. at 587 (quoting with approval *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

In holding that an Oklahoma statute, which allowed political parties to open their primary elections to only their own party members and voters registered as independents, did not violate the First Amendment rights of the Libertarian Party of Oklahoma, the Supreme Court refused to apply a strict scrutiny analysis because the burden imposed by the statute was not "severe":

> [O]ur cases since *Tashjian* [v. *Republican Party of Conn.*, 479 U.S. 208 (1986)] have clarified [that] strict scrutiny is appropriate only if the burden is severe. [*California Democratic Party v.*] *Jones*, [530 U.S. 567 (2000)], *supra*, at 582, 147 L. Ed. 2d 502, 120 S. Ct. 2402; *Timmons*, 520 U.S. at 358, 137 L. Ed. 2d 589, 117 S. Ct. 1364.

> * * *

> Many electoral regulations, including voter registration generally, require that voters take some action to participate in the primary process. See, *e.g., Rosario v Rockefeller*, 410 U.S. 752, 760-762, 36 L. Ed. 2d 1, 93 S. Ct. 1245 (1973) (upholding requirement that voters change party registration 11 months in advance of the primary election). Election laws invariably "affec[t] – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson v Celebrezze*, 460 U.S. 780, 788, 75 L. Ed. 2d 547, 103 S. Ct. 1564 (1983).

> These minor barriers between voter and party do not compel strict scrutiny. See *Bullock v Carter*, 405 U.S. 134, 143, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972). To deem ordinary and widespread burdens like these severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result, for it is beyond question "that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons, supra*, 520 US at 358, 137 L. Ed. 2d 589, 117 S. Ct. 1364; *Storer v Brown*, 415 U.S. 724, 730, 39 L. Ed. 2d 714, 94 S. Ct. 1274 (1974). Oklahoma's semiclosed primary system does not severely burden the associational rights of the state's citizenry.

> C

> When a state electoral provision places no heavy burden on associational rights, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons, supra*, at 35, 137 L. Ed. 2d 589, 117 S. Ct. 1364 (internal quotation marks omitted); *Anderson, supra*, at 788, 75 L. Ed. 2d 547, 103 S. Ct. 1564.

*Clingman*, 544 U.S. at 592-93. *Clingman* follows, and is consistent with, *Timmons*, which likewise refused to apply strict scrutiny to a challenge to a Minnesota law prohibiting multi-party or "fusion" candidates from appearing on the ballot. In rejecting the claim of the National New Party that the Minnesota regulation violated its First and Fourteenth Amendment rights, the Supreme Court stated:

> [I]t is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder. *Burdick [v. Takushi*, 504 U.S. 428 (1992)], *supra*, at 433 (""[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process'") (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *Tashjian, supra*, at 217 (The Constitution grants States "broad power to prescribe the 'Time, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices").

When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the "'character and magnitude'" of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Burdick, supra*, at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's "'important regulatory interests'" will usually be enough to justify "'reasonable, nondiscriminatory restrictions.'" *Burdick, supra*, at 434 (quoting *Anderson, supra*, at 788); *Norman* [*v. Reed*, 502 U.S. 279 (1992)]*, supra*, at 288-289 (requiring "corresponding interest sufficiently weighty to justify the limitation"). No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. *Storer, supra*, at 730 ("[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious . . . . The rule is not self-executing and is no substitute for the hard judgments that must be made.").

*Timmons*, 520 U.S. at 358-59.

Although the majority purportedly undertakes the requisite balancing required by the Supreme Court's decision in *Anderson*, it declines to recognize that a party challenging a State's reasonable and nondiscriminatory regulatory interests bears "a heavy constitutional burden." *Schrader v. Blackwell*, 241 F.3d 783, 790-91 (6th Cir. 2001). Rather than highlight this "heavy constitutional burden," alongside the wide discretion a state has to regulate its election system, *see Jenness v. Fortson*, 403 U.S. 431, 442 (1971), the majority cites several decisions that allegedly represent the "weight" of authority disapproving of early filing deadlines. In doing so, however, it declines to note the significant distinction between those cases and this case; i.e., that the language of Ohio's laws in this case refer to *a* political party, as opposed to singling out minor parties or independent candidates. Indeed, the decisions cited by the majority for the proposition that early filing deadlines impose a severe burden predominantly deal with cases in which the deadline for *independents (or minor parties)* to file was substantially in advance of the primary election. *See, e.g, Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 878 (3d Cir. 1997) (striking down state statutory scheme requiring candidates to meet certain requirements before being recognized as a political "party"); *New Alliance Party of Ala. v. Hand*, 933 F.2d 1568, 1571 (11th Cir. 1991) (same); *McLain v. Meier*, 637 F.2d 1159, 1161 n.2 (8th Cir. 1980) (same); *MacBride v. Exon*, 558 F.2d 443, 445 (8th Cir. 1977) (holding statute constitutionally infirm "which relates to the formation of new political parties in the state" (exact language of statute not provided in the opinion's text)); *Cripps v. Seneca Cty. Bd. of Elections*, 629 F. Supp. 1335, 1338 (N.D. Ohio 1985) (providing specific statute with corresponding specific deadlines for independent candidates).

Unlike those decisions, the Ohio election regulations in this case impose equal obligations on all political parties. Ohio therefore "retains the right to ensure that candidates claiming to represent a political party meet the statutory requirements necessary to establish that the putative party has obtained 'some preliminary showing of a significant modicum of support' before appearing on the ballot as a candidate of that party." *Schrader*, 241 F.3d at 791 (quoting *Jenness*, 403 U.S. at 442).

Most problematically, Judge Gibbons arbitrarily characterizes "major parties" as Republican and Democrat and "minor parties" as all other political parties, despite the lack of any such distinction in Ohio's election laws. By framing the issue in these terms, the opinion glosses over the laws' equal treatment and applicability to *all* political parties.

This court recently confronted a substantially similar fact pattern in *Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005). In *Lawrence*, the plaintiffs, one a citizen who sought to be an independent congressional candidate and the other a voter, challenged the constitutionality of Ohio's early filing deadline for congressional candidates (found at OHIO REV. CODE § 3513.257). After the district court denied plaintiffs' motion for preliminary injunction, this court affirmed and, in doing so, found Ohio's early filing deadline for congressional candidates constitutional. Admittedly, *Lawrence* addressed the impact of an early filing deadline in isolation, as opposed to the cumulative effect of an early filing deadline in conjunction with the primary election requirement. The *Lawrence* court's analysis is nonetheless instructive on the issue of what level of scrutiny applies. Indeed, in a particularly relevant passage distinguishing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), a decision upon which the majority in this case relies, our court observed:

> Plaintiffs point out that in the *Anderson* case the Supreme Court found that an Ohio law requiring independent presidential candidates to file in March imposed a significant burden on independents and those inclined to vote for them. However, Plaintiffs gloss over a vital distinction. The early deadline discussed in *Anderson* imposed such a significant burden because it put *independent candidates* at a disadvantage vis-a-vis the major parties' nominees who were not named until nearly five months later. In this case, congressional candidates who seek a place on the ballot through the primary process must file a declaration of candidacy sixty days before the primary election. OHIO REV. CODE § 3513.05. Consequently, all candidates seeking a place on the ballot in November must engage in substantial campaign work before the early primary in order to obtain a space on the ballot. Those running in a primary must file sixty days before the primary, campaign, and win their party's primary while independent candidates must spend the time before the primary acquiring the requisite number of signatures and then file their petition by the day before the primary. All candidates are burdened by the fact that Ohio chooses to conduct its primary at an early date, but there is no particular group which feels the additional burden of being placed at a disadvantage with respect to the rest of the field. The district court correctly concluded that this difference between this case and the *Anderson* case is significant. *Here the burden imposed by Ohio's early deadline is nondiscriminatory.*
>
> *There is no reason for this Court to conclude that the burden Ohio has placed on all candidates to engage in significant campaign efforts prior to March in order to obtain a place on the ballot is severe or inherently unreasonable.*

*Lawrence,* 430 F.3d at 373 (emphasis added). Accordingly, we held "the early filing deadline is both reasonable and nondiscriminatory and, therefore, within Ohio's constitutional authority to regulate elections as long as it advances an important state regulatory interest." *Id*. at 374.

In thereafter examining whether Ohio's congressional election scheme constitutionally advanced an important state regulatory interest, our court provided the following analysis:

> Although Ohio requires independent candidates to submit their signature petitions earlier than most deadlines which have been upheld, the required number of signatures is only one percent of the relevant voting population. OHIO REV. CODE. § 3513.257(C). Since a state's interest in verifying [that] a candidate has a modicum of support justifies a burden of requiring signatures of five percent of voters by July or August, it is logical to infer that the burden Ohio has imposed by requiring signatures of only one percent by an earlier deadline is similarly justifiable. *The signature requirement meets Ohio's important state interest in verifying a candidate's support, and the early deadline meets Ohio's important state interest of*

*equal treatment of candidates and its administrative interest of being able to process independent candidates' petitions and verify signatures in the midst of completing a host of other tasks necessary to conduct a fair election.* Therefore, Ohio has important state regulatory interests which are sufficient to justify the reasonable and nondiscriminatory burdens imposed by its early filing deadline.

Plaintiffs' arguments that there are no legitimate state interests which justify such an early deadline are unpersuasive. Plaintiffs argue that placing the filing deadline so many months before the November election is not necessary. Though there is case law to support this proposition, it comes from cases in which strict scrutiny was applied and the state was, therefore, obligated to demonstrate that there was no less restrictive means by which it could achieve its important interest. *See New Alliance Party*, 933 F.2d at 1576. *Since strict scrutiny is not appropriate in this case*, Plaintiffs' arguments and citations are inapposite.

*Id.* at 375 (emphasis added). As a result of the foregoing analysis, we upheld Ohio's early filing deadline for its congressional election. Like the observations made by our court in *Lawrence*, the election laws in this case burden all political parties equally and the authority relied upon by the majority focuses on laws singling out so-called "independent" or "minor" parties.

The lead makes only brief reference to *Lawrence*, but makes no effort to distinguish or discuss it. In fact, the opinion confusingly *relies* on the *Lawrence* decision, observing that *Lawrence* "explicitly distinguished cases in which courts had found that deadlines far in advance of the primary election imposed a severe burden on the rights of political parties, candidates, and voters." It is difficult to understand how *Lawrence* supports the majority in that it *upheld* an Ohio law requiring an early filing deadline.

The majority thematically relies on the "collective burdens" imposed by the early filing deadline *in conjunction with* the primary election requirement. As the district court aptly noted, however, "any filing deadline, no matter how late in the election cycle it comes, will preclude some candidate or some political coalition from obtaining recognition on the ballot." Moreover, the Supreme Court has held that it is considered "too plain for argument" that a state may require parties to use a primary election for selecting their nominees. *American Party of Tex. v. White*, 415 U.S. 767, 781 (1974). *See also Storer v. Brown*, 415 U.S. 724, 733-36 (1973).

In isolation, or in tandem, the Ohio requirements of primary election and 120-day pre-election filing of petitions are reasonable. These election regulations do not impose a "severe" burden on plaintiffs' First and Fourteenth Amendment rights.[1] In fact, the only evidence in the record on this issue is that in 2004, and in two preceding elections, plaintiff LPO was able to comply

---

[1]Although discussed by Judge Gibbons, it is important to note that plaintiffs do not contest Ohio's five percent automatic ballot access threshold or one percent signature requirement. In this regard, numerous courts have previously found no constitutional infirmity in a state's requirement that a political party file a petition bearing a number of signatures equal to five percent of the total votes cast in the last election. *See, e.g.*, *Jenness*, 403 U.S. at 439, 442 (upholding five percent figure because of the "open quality of the Georgia system"); *Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. 1999) ("[A] requirement that ballot access petitions be signed by at least five percent of the relevant voter pool is generally valid, despite any burden on voter choice that results when such a petition is unable to meet the requirement."); *Libertarian Party of Ill. v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997) (upholding five percent signature requirement); *Rainbow Coalition v. Oklahoma State Election Bd.*, 844 F.2d 740 (10th Cir. 1988) (finding constitutional Oklahoma's election scheme that authorizes candidates of recognized parties to be automatically identified on the ballot, but requires unrecognized parties to file petitions bearing five percent of total votes cast in last election before allowing party designation). Indeed, as previous courts have likewise noted, such a requirement makes sense given the state's interest in "requiring some preliminary showing of a significant modicum of support" before printing a candidate's name on the ballot in order to "avoid[] confusion, deception, and even frustration of the democratic process at the general election." *Jenness*, 403 U.S. at 442.

with these election requirements. Moreover, according to plaintiffs' expert Richard Winger, in 1996 the Natural Law Party and the Reform Party qualified for the Ohio ballot, in 1998 the Libertarian Party and the Reform Party, and in 2000 the Libertarian Party and the Natural Law Party.

The lead opinion summarily concludes:

Put simply, the restrictions at issue in this case [primary election and 120-day pre-election filing] serve to prevent a minor political party from engaging in the most fundamental of political activities – recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately the right to govern.

However, the evidence is contrary to the majority's holding. In fact, the most compelling evidence that the challenged Ohio election rules do not deprive the LPO of its First Amendment rights is that, in the past and through the present day, the LPO's First Amendment rights have *not* been denied. The possibility of *future* deprivation is pure conjecture.

In regard to the 120-day pre-election petition filing deadline, at oral argument counsel for plaintiffs conceded its reasonableness. Plaintiffs do not dispute that, to maintain fair and orderly elections, a 120-day pre-election filing is necessary under the following general time parameters: 30 days for administrative verification of the petition form and authenticity of the required signatures; 30 days for administrative and/or judicial appeals of ballot qualification or disqualification; 30 days for the printing and distribution of proof ballots with invited corrections from the political parties and candidates, and printing and distribution of final ballots; and 30 days for the distribution of absentee ballots. Apparently, the majority would legislate a lesser, but unspecified, time frame. However, my colleagues make no argument that the 120-day time period is unreasonable. ("It is true that a 120-day period may be a reasonable amount of time to process the registration of a political party . . . .")

Finally, the majority's reliance on the "minor" party history of other states is misplaced. Each of our fifty states has its unique political dynamic. Consider the success of the Conservative and Liberal parties in New York and the Green Party and Libertarian Party in some states. The failure of third or fourth parties to thrive in Ohio is not likely the result of the challenged requirements of primary election and 120-day pre-election petition filing, but rather voter ideology, traditional party loyalty to the Republican and Democrat parties, and the *unchallenged* five percent automatic ballot access threshold.

In conclusion, absent a constitutional violation, it is the province of the legislature, not the courts, to write our election laws. Here, the challenged Ohio election regulations treat the LPO the same as any other political party. The primary election required by the Ohio Constitution and petition filing time requirements chosen by the Ohio General Assembly are not severe, but reasonable, in order to insure a fair, honest, and orderly election. *Clingman*, 544 U.S. at 581; *Timmons*, 520 U.S. at 358. Therefore, the challenged Ohio election regulations do not violate the Constitution of the United States.

For these reasons, I respectfully dissent.